MARTIN S. STOLZOFF, individually and as trustee,[1] & others[2]
vs. WASTE SYSTEMS INTERNATIONAL, INC., & others.[3]

No. 01-P-68.

Middlesex. November 7, 2002. - August 7, 2003.

Present: PORADA, LENK, & COWIN, JJ.

*Limitations, Statute of. Practice, Civil,* Statute of limitations, Fraud. *Fraud.
Negligence,* Misrepresentation. *Corporation,* Stock. *Consumer Protection
Act,* Securities transactions. *Securities,* Sale. *Sale,* Of stock. *Uniform
Securities Act.*

In an action brought against a company, its founders, one executive officer,
and individuals and entities who provided the company with investment
banking services, alleging that they had engaged in a scheme to defraud
the plaintiffs by making various misrepresentations and omissions upon
which the plaintiffs relied to their detriment in buying and holding the
company's stock, the judge erred in concluding that certain fraud and
misrepresentation claims were time-barred, where an issue of material fact
existed whether the statute of limitations had been tolled by application of
the fraudulent concealment doctrine [755-759]; further, the judge erred in
concluding that certain other fraud and misrepresentation claims failed
because the misrepresentations at issue were not factual in nature (and
hence not actionable) or, to the extent they were factual, were either not
material or not reasonably relied on by the plaintiffs [759-764].
In an action alleging fraud, misrepresentation, and violations of the Uniform
Securities Act and G. L. c. 93A, the judge erred in dismissing all claims on
the ground that they did not meet the requirement of Mass.R.Civ.P. 9(b),
365 Mass. 751 (1974), that they be pleaded with particularity, where, even
assuming the propriety of applying that pleading requirement to the
plaintiffs' non-fraud claims, the allegations contained considerable specific-
ity or, where they did not, the interests of justice would be better served by

---

[1] Of the Stolzoff Family Trust.

[2] David Wilstein, as trustee of the Century Trust U/A/D; Leonard Wilstein,
individually and as trustee of the Lovejoy Trust U/A/D and Somerstree
Limited; Ronald Wilstein; and Gary I. Wilstein, as trustee FBO of the 1994
Gary & Kathryn Wilstein Revocable Trust.

[3] Dr. Richard H. Rosen; Philip Strauss; Dr. Robert S. Davis; U.S. Sachem
Financial Consultants, L.P.; Sachem Financial Consultants, Ltd.; Capital
Growth International LLC; International Capital Growth, Ltd.; Ronald Koenig;
Stanley Hollander; and Jay Matulich.

giving the plaintiffs, as they requested, leave to amend their claims. [764-765]

In an action alleging fraud, misrepresentation, and violations of the Uniform Securities Act and G. L. c. 93A, the judge erred in dismissing the plaintiffs' Uniform Securities Act and G. L. c. 93A claims, where they were based on the same representations and omissions that formed the basis of the plaintiffs' viable fraud and negligent misrepresentation claims. [765-766]

CIVIL ACTION commenced in the Superior Court Department on March 26, 1999.

The case was heard by *Hiller B. Zobel*, J., on motions for summary judgment.

*Matthew E. Miller* for the plaintiffs.

*Lawrence M. Kraus* for U.S. Sachem Financial Consultants, L.P., & others.

*R. Todd Cronan* for Waste Systems International, Inc., & others.

LENK, J. Between March, 1995, and February, 1997, the five out-of-State plaintiffs separately and repeatedly bought stock in a Massachusetts-based company now known as Waste Systems International, Inc. (the company). The company did quite poorly,[4] and the plaintiffs allege that they have together lost approximately one million dollars. In March, 1999, the plaintiffs brought suit against the company, its two founders, another of its executive officers, and the individuals and entities who provided the company with investment banking services during the period in which the plaintiffs bought stock. The plaintiffs claim, in essence, that the defendants engaged in a scheme to defraud them by making various misrepresentations and omissions upon which the plaintiffs relied to their detriment in buying and holding the company's stock. Acting on the defendants' motions to dismiss and for summary judgment, the judge, in an omnibus order, summarily disposed of all the plaintiffs' claims

---

[4]The company and its wholly owned subsidiaries filed for protection pursuant to Chapter 11 of the Bankruptcy Code on January 11, 2001, automatically staying this appeal as to the company. The plan of reorganization became effective on June 28, 2002, and, on October 23, 2002, the U.S. Bankruptcy Court for the District of Delaware entered an order approving a stipulation concerning relief from said stay, the thrust of which, for our purpose, is that the stay against the company has been lifted.

of fraud, misrepresentation, and violations of both the Uniform Securities Act[5] and G. L. c. 93A.[6]

---

[5]G. L. c. 110A, § 410(*a*)(2), and G. L. c. 110A, § 410(*b*).

[6]This case comes to us in a somewhat muddled procedural posture. The plaintiffs brought their complaint on March 26, 1999, and filed an unverified amended complaint in June, 1999. Within months thereafter, various defense motions were filed. Hollander filed a motion to dismiss for lack of personal jurisdiction under Mass.R.Civ.P. 12(b)(1), 365 Mass. 755 (1974), but later withdrew it; the judge nonetheless subsequently allowed it. All other defendants, with the apparent exception of Rosen and Davis, moved to dismiss the complaint under Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974), contending that the plaintiffs had failed to state any actionable misrepresentations or omissions and that most of the plaintiffs' common-law claims were, in any event, barred by the applicable three-year statute of limitations. The company and Strauss, however, brought their motion pursuant to rule 12(b)(6) or, in the alternative, as one for summary judgment under Mass.R.Civ.P. 56, 365 Mass. 824 (1974). Their motion was accompanied by seven unverified documents, which they characterized as "publicly available." (The documents included a summary of the plaintiffs' stock purchases; the company's stock prices from June, 1995 to March, 1996; excerpts from the company's February 17, 1995, private placement memorandum, September 5, 1995, offering memorandum, and June 26, 1995, Form S-1 registration statement; excerpts from the company's 1995 annual report; and a March 27, 1996, company press release. Most, if not all, of the foregoing were referenced in the amended complaint.) It appears that little, if any, discovery had yet occurred. The plaintiffs opposed the motions, submitting brief affidavits from plaintiffs Stolzoff and David Wilstein; they did not seek a continuance on the basis of rule 56(f). Notwithstanding the nomenclature of the various motions before him, the judge disposed of the plaintiffs' claims on summary judgment, but on a basis suggesting that the plaintiffs' claims, to the extent not time-barred, were not legally sufficient to support recovery, even if all their factual allegations were taken as true.

On appeal, neither the bankrupt company nor Davis filed a brief. The plaintiffs acknowledge in their brief on appeal that, although neither Rosen nor Davis had filed motions to dismiss below, the judge's reasoning and ruling would also apply to the claims asserted against them. Some of the defendants suggest on appeal that the plaintiffs had agreed below that all rule 12(b) motions filed would be regarded, in the alternative, as rule 56 motions for summary judgment, and they attempt to make much of the plaintiffs' purported failure to submit substantive verified submissions, even though the defendants did not support their motions with any verified materials. In contrast, the plaintiffs maintain that, because the judge ruled, in substance, only as to the legal sufficiency of their claims, we should review the motions as having been brought under rule 12(b)(6).

For us to wade further in this procedural quagmire would be unproductive. Because the judge entered summary judgment and appears to have considered the amended complaint as verified for purposes of his ruling and also considered the unverified documents submitted by the defendants, we do so as well, in the interests of judicial economy. We regard these submissions and

*Facts.* As we recite them, the facts are primarily taken from the plaintiffs' sixty-three page amended complaint and from the unverified documents submitted by the defendants. We summarize the facts of record in the light most favorable to the plaintiffs as nonmoving parties, bearing in mind that the defendants, for the purposes of their motions, essentially accept as true the plaintiffs' contentions as to the substance and circumstances of the various representations and omissions, only some of which are recited here. (See note 6, *supra.*)

1. *The persons and entities involved.* The plaintiffs Martin Stolzoff and David Wilstein (Stolzoff and Wilstein) played a major role in the investments made by all five plaintiffs. They were the initial plaintiffs who were solicited to invest in the company and the first plaintiffs to purchase stock; they thereafter maintained regular communication with the company and its investment bankers. The other three plaintiffs became investors at Wilstein's behest; they are Wilstein's brother (Leonard) and Wilstein's nephews (Gary and Ronald, Leonard's sons) (respectively, Wilstein's brother and Wilstein's nephews). All the plaintiffs but Ronald, a Utah resident, live in California.

The company[7] was founded in 1990 by defendants Richard Rosen and Robert Davis. From the time the plaintiffs became investors in 1995 until 1997, the company's primary focus was landfill remodeling or landfill mining, which used the techniques of surface mining to excavate wastes buried within landfills. In this process the excavated waste is sorted and screened to recover soil and recyclables, and the space thereby created in the landfill can later be refilled. Cofounder Davis was the company's executive vice-president, secretary, and a director from March until August, 1995; cofounder Rosen was its president from March, 1995 until March, 1996. Philip Strauss was chief operating officer from September, 1995, until June,

the two plaintiffs' affidavits as constituting the summary judgment record and review to determine whether the defendants established that there is no genuine issue as to any material fact and that they are entitled to judgment as matter of law.

[7]The company was known formerly as Zoe Capital Corp. and, through a reverse merger transaction on March 29, 1995, involving BioSafe, Inc., emerged as BioSafe International and, following a merger on October 27, 1997, became the company.

1996, when he became the company's president and chief executive officer.

During the relevant period, the company used the services of investment bankers, including the defendants U.S. Sachem Financial Consultants, L.P. (Sachem), Capital Growth International LLC (CGI), and International Capital Growth, Ltd. (ICG) (individually and collectively, the Sachem entities).[8,9] At all relevant times, Ronald Koenig was chairman of CGI and Sachem; Stanley Hollander was president and chief executive officer of CGI as well as president of Sachem, and Jay Matulich was senior vice-president of Sachem and CGI. (Koenig, Hollander, and Matulich, with the Sachem entities, are sometimes referred to as the Sachem defendants.) In addition to his role with the Sachem entities in providing investment banking services to the company, Matulich served on the company's board of directors beginning in March, 1995, chaired the board's executive committee after July 24, 1995, and became acting chairman of the board for a few months in 1996. Koenig also participated in board meetings of the company.

2. *Events preceding the company's Fairhaven landfill mining project.* As part of the Sachem entities' role as placement agent for the company, Hollander and Matulich began to solicit Stolzoff as a potential investor in January, 1995. Through him, they learned of and solicited Wilstein. They told both men, among other things, that the company was soon to begin a landfill remodeling project in Fairhaven, Massachusetts; that the company would have its pick of other remodeling projects; and that such projects, using the company's experience and proprietary technology, would soon generate substantial revenue.

Both men were also provided with company literature touting

---

[8]Also named as a defendant is Sachem Financial Consultants, Ltd., Sachem's general partner. ICG was a wholly owned subsidiary of MicroCap Financial Services, Inc., a company in which Koenig and Hollander were primary shareholders. Hollander was president and chief executive officer of ICG, while Matulich was its senior vice-president.

[9]In serving as the company's placement agent for its March, 1995, private placement of stock, and its October/November, 1995, and June, 1996, regulation S offerings, the relevant Sachem entities received several six-figure fees, a large number of shares in the company, and warrants to purchase more stock at favorable prices, as well as a one-year fee generating consulting arrangement.

the venture and with copies of the February 17, 1995, private placement memorandum containing, among other things, certain risk disclosures that we later discuss in more detail. Both were assured that, after the private placement, the Sachem defendants would remain fully informed as to the company's business operations and would serve as its financial consultant, that Matulich would serve as a director, and that Koenig would meet weekly with company personnel. In reliance on this and other information with which the defendants provided them, Stolzoff and Wilstein each purchased a substantial number of shares and warrants on March 28, 1995. Following their initial stock purchases, each tried to monitor how things were going with the company and each was encouraged over time to make further investments. Stolzoff spoke frequently with Hollander and Matulich and on occasion with Rosen and Koenig, while Wilstein spoke regularly with Matulich and occasionally with Rosen.

3. *Fairhaven landfill mining project.* From the time of the April 19, 1995, groundbreaking, problems bedeviled this project, the company's first and only landfill mining project. For months after it opened, local residents complained repeatedly of foul odors and dust emissions; there were also operational problems and regulatory violations stemming from exposed refuse, improper stockpiling of reclaimed soil, soil erosion, windblown litter and similar problems. The company was unable to recover much of value from the mined landfill, and it suspended, and never resumed, landfill remodeling in August, 1995. The Department of Environmental Protection issued a "cease excavation" order in September, 1995; notices of noncompliance followed. Area residents filed suit concerning the project in November, 1995.

It was not until May of 1996, when the company's 1995 annual report came out, that the defendants, in any fashion, disclosed any of the project's woes to the plaintiffs. Instead, during regular conversations in the period following the Fairhaven groundbreaking, Stolzoff and Wilstein were assured that the project was a "great success" and was proceeding "smoothly" and "better than expected," that it was popular with area residents, that there were no odor problems, and that

revenues from mined dirt exceeded expectation. Even when the annual report disclosed the lawsuit and the problems it alleged, the plaintiffs were assured by Matulich that the lawsuit had no merit and was brought by neighboring landowners to induce the company to buy their land at inflated prices.

4. *Other landfill remodeling projects.* Beginning in May, 1995, and continuing until March, 1996, the company sent shareholder letters and issued press releases indicating that it would be remodeling other landfills, that it had won contracts with various municipalities to do so, and that these projects would generate substantial revenue.[10] During meetings and telephone conversations with Stolzoff, Wilstein, and Wilstein's brother, company cofounder Rosen, as well as Matulich, Hollander, and Koenig, told them the same thing and predicted that the company's stock would trade at fifteen to twenty dollars per share by the end of the year. In fact, the company had only entered into preliminary agreements to investigate the feasibility of landfill remodeling at these other sites; neither the company nor any municipality had begun the necessary permit process for such projects; and such agreements were of no financial benefit to the company.

5. *Management difficulties.* About a week after the April 19, 1995, Fairhaven project groundbreaking, company cofounder Davis tendered his letter of resignation effective August, 1995, citing his dissatisfaction with the company's management and his belief that the company would fail if changes were not made. Davis knew as early as February, 1995, that cofounder and company president Rosen was misappropriating company funds; most if not all of the remaining defendants knew this by mid-1995. The company's chief financial officer, Rivkin, learned of Rosen's misappropriations in May, 1995, and told Matulich and Koenig; they decided not to take any action in light of Davis's recent resignation and the adverse effect that disclosure of the remaining cofounder's misdeeds would have on stock price. The board put a spending limit on Rosen in late July,

---

[10]For example, a January 10, 1996, company press release stated that, "[i]n aggregate, the landfill agreements [the company] now has under contract represent approximately $500 million in expected revenues over the life of the various projects."

1995; authorized an audit in late January, 1996; appointed a special board committee to investigate Rosen's spending in March, 1996; and, at the end of that month, forced Rosen to resign, with Strauss replacing him as president and chief executive officer. By mid-July, 1996, the company was in arbitration over Rosen's defalcations and sought injunctive relief to prevent public disclosure of information that might adversely affect the market for its stock.

There was no public announcement of Davis's April 29, 1995, resignation; the company first mentioned it in a footnote to the November, 1995, prospectus. Some time around August of 1995, Stolzoff learned that Davis had left the company; Wilstein received the information in November, 1995. Each was given a less than candid explanation for Davis's departure and was assured that, since Davis had accomplished his work for the company, his departure would make no difference. None of Rosen's financial misdeeds were publicly disclosed and, while Rosen's March, 1996, resignation was publicly announced, the reasons for it were not. Almost a year later, the company acknowledged that Rosen had resigned at the board's request, but even then it did not disclose the reason for the forced resignation. When discussing the Rosen resignation with Stolzoff and Wilstein in late spring of 1996, Matulich (then chairman of the board) indicated that it had been by mutual agreement and, that, given the maturation of the company and its evolving needs, the board wanted someone with operational experience — like Strauss, not Rosen — in charge.

6. *The company's offering memoranda and public filings.* In timely fashion, Stolzoff and Wilstein received copies of a confidential private placement memorandum dated February 17, 1995, a Form S-1 registration statement dated June 26, 1995, and a confidential offering memorandum dated September 5, 1995. Only the February 17, 1995, document predates Stolzoff's and Wilstein's initial investment. Their subsequent investments, as well as those made by Wilstein's brother and nephews, were largely made in the months after the June 26, 1995, filing.[11]

Each of the documents contains much the same information,

---

[11]A list summarizing the plaintiffs' stock purchases is appended to this opinion. The price of stock in the period from the months ending June, 1995,

at least as to the risks disclosed to potential investors. Each indicates that purchasing the company's securities involves a high degree of risk. Each discloses, among other things, that, although the company conducted significant testing of products, systems, and services based on its technologies, with which the company's principals had extensive experience in other commercial applications, the company had not yet developed, operated, or sold any waste-treatment system for commercial use or carried through to completion a landfill remodeling project; that there could be no assurance that the company would be successful in doing so or in doing so profitably; that the company's business operated in a highly regulated environment requiring various permits and approvals that the company might not be able to obtain or keep; that the Fairhaven project was subject to certain regulatory and financial contingencies and its success could not be assured; and that the company was "highly dependent" upon the efforts of its founders. As to this latter point, the February 17, 1995, private placement memorandum references both Davis and Rosen, stating "[t]he loss of the services of either of the founders would have a material adverse effect on the [c]ompany." The June 26 and September 5, 1995, documents make no further mention of Davis in this regard, stating only that Rosen's departure would have a material adverse effect on the company. There was apparently also a November, 1995, prospectus, but no excerpts from it are in the record.

*Analysis.* In disposing of all the plaintiffs' claims against all the defendants, the motion judge determined that the bulk of the common-law tort claims were time-barred and that the remainder of the claims were either nonactionable or not suitably pleaded.

1. *The fraud and misrepresentation claims.*

a. *Statute of limitations.* About this much all can agree: the common-law torts of fraud and misrepresentation are subject to a three-year statute of limitations; the plaintiffs completed

through March, 1996, was as follows: June, 1995: $8.125; July, 1995: $7.50; August, 1995: $7.00; September, 1995: $6.625; October, 1995: $6.00; November, 1995: $4.3125; December, 1995: $4.1875; January, 1996: $3.75; February, 1996: $3.375; March, 1996: $3.00.

twenty-nine stock purchases[12] between March, 1995, and February, 1997, twenty-one of them before March 26, 1996; the plaintiffs filed suit on March 26, 1999; and all but eight of the purchases (and the common-law tort claims that rest on them) are time-barred unless tolled by the fraudulent concealment doctrine.

The motion judge concluded, and the defendants argue on appeal, that the limitations period was not tolled because the plaintiffs had been on notice of their claims by virtue of (1) the written risk disclosures contained in the February, 1995, private placement memorandum and the June, 1995, registration statement and (2) the decline in stock price between June, 1995 and March, 1996. See note 11, *supra.* The judge construed the aforesaid written risk disclosures as contradicting other oral and written statements upon which the plaintiffs relied in making their investments; the divergence, in his view, obliged the plaintiffs to be more diligent than they had been in evaluating the possibility of fraud. He stated that the stock's decline in price "would suffice to alert a reasonable person to the unsoundness of the investment. If [p]laintiffs, in a triumph of hope over experience, chose not to respond to the storm signals, they cannot complain of their subsequent dousing." We take a different view, holding that, on the record before us, there is an issue of material fact whether the statute of limitations is tolled by application of the fraudulent concealment doctrine.

Under that doctrine, codified in G. L. c. 260, § 12,[13] in the absence of a fiduciary relationship, as here,[14] the statute of limitations is tolled if the wrongdoer "concealed the existence of a cause of action through some affirmative act done with

---

[12]Although the parties refer to twenty-nine stock purchases, we count thirty.

[13]General Laws c. 260, § 12, provides that "[i]f a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."

[14]"Where a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying § 12." *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 519 (1997). The plaintiffs have not set forth any facts to establish, under any relevant State's law, that a fiduciary relationship existed between any of the plaintiffs and any of the defendants; accordingly, this rule has no pertinence.

intent to deceive." *Puritan Med. Center, Inc.* v. *Cashman*, 413 Mass. 167, 175 (1992), quoting from *Frank Cooke, Inc.* v. *Hurwitz*, 10 Mass. App. Ct. 99, 108 (1980). However, if the plaintiff has either actual knowledge of his claim or the "full means of detecting the fraud," the limitations period is not tolled. *Lynch* v. *Signal Fin. Co.*, 367 Mass. 503, 508 (1975).

We are satisfied that the plaintiffs' asserted facts, uncontroverted for the purposes of the subject motions, would permit a finding that the defendants engaged in affirmative acts with the intent to deceive. A fact finder could conclude that, by means of numerous false representations made about the status of the Fairhaven project and the company's success in landing lucrative contracts for other landfill projects, the defendants affirmatively concealed the true state of affairs from the plaintiffs in order to induce them to purchase and retain stock in the company. Contrast *Szymanski* v. *Boston Mut. Life Ins. Co.*, 56 Mass. App. Ct. 367, 380-381 (2002) (no allegation of an affirmative act that would invoke doctrine of fraudulent concealment; silence insufficient to constitute affirmative act.)

It appears that the plaintiffs first had actual knowledge of problems besetting the Fairhaven project in May, 1996, when they received the company's 1995 annual report disclosing the citizens' lawsuit.[15] The defendants contend that well before that time the plaintiffs had the "full means of detecting the fraud." The record shows, however, that Stolzoff and Wilstein live in California and that neither read any Massachusetts newspapers carrying stories about the problems at Fairhaven nor had any contact with the Massachusetts Department of Environmental Protection. Consequently, it cannot be said as matter of law that the plaintiffs had the "full means" of uncovering either the problems at the Fairhaven site or the true nature of the municipal "contracts" said to have been awarded the company. See and compare *Tracerlab, Inc.* v. *Industrial Nucleonics Corp.*, 313 F.2d 97, 101-102 (1st Cir. 1963).

The defendants nonetheless insist that, as matter of law, the plaintiffs did have the "full means of detecting the fraud" insofar as they plainly knew of the steady decline in the price

---

[15]Assuming the statute of limitations began to run at this time, the filing date of March 26, 1999, was within the three-year limitations period.

of company stock,[16] coupled with the risk disclosures contained in the company's offering memoranda and registration statement. The plaintiff who has the "full means of detecting the fraud" is one who turns a blind eye to known or readily ascertainable facts that make the fraud evident. See *Nudd* v. *Hamblin*, 8 Allen 130, 133-134 (1864) (plaintiff could have informed herself of defendant's trespass across her property through cursory examination of land; defendant did not attempt to conceal his trespass); *Brackett* v. *Perry*, 201 Mass. 502, 505 (1909) (plaintiff had received information that directly contradicted fraudulent representations); *Lynch* v. *Signal Fin. Co.*, 367 Mass. at 508 (discovery of nondisclosures in connection with loan transaction required merely the making of mathematical calculations from known data or receipt of information as to disclosure law requirements); *Stark* v. *Advanced Magnetics, Inc.*, 50 Mass. App. Ct. 226, 234 (2000) (annual reports received by plaintiff revealed defendant was claiming for itself plaintiff's alleged inventions).

While the steady dip in stock price may well have raised some red flags about the company's vitality, stock prices falter for many nonfraudulent reasons, and it cannot be said as matter of law that the plaintiffs must have, from this information alone, reasonably drawn the conclusion that they had been defrauded. Suspicion or conjecture does not satisfy the "full means" standard. *Demoulas* v. *Demoulas Super Mkts.*, 424 Mass. 501, 520 n.25 (1997). *Tracerlab, Inc.* v. *Industrial Nucleonics Corp.*, *supra* at 102. As to the risk disclosures in the February, 1995, private placement memorandum and the June, 1995, registration statement, these and later such documents described certain contingencies that, if they were to occur, *might* adversely affect the company's operations and its success. They did not disclose actual adverse occurrences that developed or contradict later misrepresentations of fact made after the Fairhaven project was under way. Hence we cannot say, as matter of law, that the written risk disclosures put the plaintiffs on notice of actual

---

[16]Beginning on November 13, 1995, the company's stock was listed and traded on the National Association of Security Dealers Automated Quotation System (NASDAQ) market.

problems that had materialized. A factual question exists as to whether the common-law tort claims are time-barred.[17]

b. *The substance of the common-law claims.* Because some of the common-law claims were not time-barred under the motion judge's analysis, he also considered the substance of the claims. The motion judge determined, and the defendants urge on appeal, that the plaintiffs' fraud and misrepresentation claims fail for one of several reasons: the asserted misrepresentations are not factual in nature and hence are not actionable or, to the extent they are factual in nature, either they are not material or the plaintiffs as matter of law could not reasonably have relied upon them. Other claims, namely those brought by Wilstein's nephews and those brought against Strauss and the Sachem entities, were thought by the judge not to have been well pleaded and failed under Mass.R.Civ.P. 9(b), 365 Mass. 751 (1974). Again, we take a different view.

In order to establish a claim of fraud, a plaintiff must show "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 8 (1982), quoting from *Barrett Assocs.* v. *Aronson*, 346 Mass. 150, 152 (1963).[18] *Reisman* v. *KPMG Peat Marwick LLP*, 57 Mass App. Ct. 100, 108-109 (2003). A statement on which liability for fraud may be based must be one of fact; it may not be one of opinion, or conditions to exist in the future, or matters promissory in nature. *Yerid* v. *Mason*, 341 Mass. 527, 530 (1960).

---

[17]In applying the closely related discovery rule, this court reversed a summary judgment that had been entered against the plaintiff on a statute of limitations defense and stated "the triggering event [to start the running of the statute of limitations] cannot be pinpointed as matter of law." *Szymanski* v. *Boston Mut. Life Ins. Co.*, 56 Mass. App. Ct. at 370.

[18]"If 'in the course of his business, . . . [the defendant] supplies false information for the guidance of others in their business transactions, [he] is subject to liability for pecuniary loss caused to [the others] by their justifiable reliance upon the information, if he fails to exercise reasonable care or compliance in obtaining or communicating the information.' " *Fox* v. *F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 587 (1996), quoting from Restatement (Second) of Torts § 552(1) (1977). Because the defendants do not suggest that the plaintiffs have in any way failed to establish the elements that distinguish fraud from negligent representation, we limit our analysis to fraud.

A fact is defined as something "susceptible of knowledge." *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 79 (1991). However, a statement of opinion may be actionable where the speaker possesses superior knowledge concerning the subject matter to which the misrepresentations relate, *Gopen* v. *American Supply Co.*, 10 Mass. App. Ct. 342, 345 (1980), or where the opinion is "reasonably interpreted by the recipient to imply that the speaker knows facts that justify the opinion." *Briggs* v. *Carol Cars, Inc.*, 407 Mass. 391, 396 (1990). The plaintiff must also show that his reliance on the misrepresentation was reasonable. See *Saxon Theatre Corp. of Boston* v. *Sage*, 347 Mass. 662, 667 (1964).

To the extent that the plaintiffs point to oral and written communications made prior to the first stock purchases in March, 1995, as having misled them into thinking that the landfill mining process was a proven one and that the company had experience with commercial landfill mining, the judge was on solid ground in concluding that the risk disclosures in the company's February, 1995, private placement memorandum contradicted such statements. In the circumstances, reliance upon such statements, well characterized as sellers' puffery, would be unreasonable as matter of law. See *Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*, 438 Mass. 459, 468-469 (2003). But there is more to ground the plaintiffs' claims than just these early statements and, as a result, we conclude that plaintiffs' fraud and misrepresentation claims withstand the defendants' summary judgment challenge.

Following the first stock purchases in March, 1995, Stolzoff and Wilstein regularly received written information from and about the company and communicated with knowledgeable company insiders about how the company — and their investments — were doing. They contend that they relied upon this information when deciding whether to buy more stock and to keep what they had. The information falls into several broad categories: (1) how the Fairhaven project was faring; (2) landfill remodeling contracts at other locations; (3) revenue projection and anticipated stock valuation; and (4) the founders' departures from the company.

(1) *The Fairhaven project.* The defendants maintain that their

upbeat representations to the plaintiffs about how well things were going, when they knew quite well the many problems the project was experiencing, were no more than expressions of opinion. To the contrary, the statements could have been understood as conveying, contrary to fact, that the project was flourishing rather than beset with the problems that it was, indeed, encountering. As such, the representations were statements of fact. See and compare *Briggs* v. *Carol Cars, Inc.*, 407 Mass. at 396.

The risk disclosures in the company's June 26, 1995, registration statement and September 5, 1995, offering memorandum do not make the plaintiffs' reliance on these statements unreasonable as matter of law. Those documents speak only of risks and contingencies: they warn of what *may* happen. Though the June and September, 1995, documents were distributed at a time when the defendants knew much more about the ongoing Fairhaven project than they knew when disseminating the February, 1995, private placement memorandum, the later documents do not advise that some of the risks and contingencies about which warning had been given in February, 1995, had, in fact, materialized. Otherwise put, the later documents do not disclose that what had once been merely possible had since become quite real. It is for a fact finder at trial to determine whether it was reasonable for each of the plaintiffs to rely upon what they were (and were not) told of the project as they held their shares and bought more over time.

(2) *Other landfill remodeling projects.* To the extent that the plaintiffs were told that the company had won various contracts to do landfill remodeling projects in other municipalities, such representations could legitimately have been understood as statements of fact, i.e., the company *had* entered into binding agreements to do the work. To the extent that other communications announced that the company would be remodeling other landfills, such statements, if standing alone, could have been seen as relating to future events and thus would fail to support a fraud claim. See *Yerid* v. *Mason*, 341 Mass. at 530. Given the circumstances in which such statements were made, however —

that the company had in fact won contracts to do this very work — the statements were embedded in that factual context and the disqualification for statements referring to future events does not fairly apply as matter of law. The defendants were, moreover, in a position of superior knowledge as to the viability of any future projects because of their awareness of the problems encountered at Fairhaven. See and compare *Gopen* v. *American Supply Co.*, 10 Mass. App. Ct. at 345; *Zimmerman* v. *Kent*, 31 Mass. App. Ct. at 80.

Nothing in the June, 1995, registration statement or September, 1995, offering memorandum contradicts these statements. The risk disclosures in those documents may cast an aura of contingency about the company's ability to begin or perform the contracts, but they do not disclose that the "contracts" were merely agreements to investigate the viability of remodeling. Whether the plaintiffs were unreasonable in their reliance upon such representations, then, cannot be determined as matter of law, but must await a trier of fact.

(3) *Revenue projections and anticipated stock valuation.* When many of the representations about projected revenue from the Fairhaven project and other municipal landfill remodeling projects were made, the defendants knew that remodeling activity at the Fairhaven site had been stalled, if not entirely halted, and that the company had only preliminary agreements to investigate the possibility of commencing other projects. As such, the defendants were in a position of superior knowledge concerning the subject matter of these representations, because expected revenue was surely to be affected by both the problems at Fairhaven and the fact that other projects did not even exist at the time these projections were made. See and compare *Gopen* v. *American Supply Co.*, *supra*; *Zimmerman* v. *Kent*, *supra*.

While the June and September, 1995, public materials warn that there can be no assurances whether prospective customers will look favorably upon and be willing to use the company's systems or that the company "will generate sufficient revenue to be profitable, or, if profitable, to maintain profitability in

future years," these disclosed risks as to the uncertainty of economic success do not reveal actual adverse occurrences in the company's operations. They do not render unreasonable as matter of law the plaintiffs' reliance on representations that the Fairhaven project was going well and that other desirable projects were slated to begin.

In contrast, statements concerning the future value of the company's stock, plainly concerning future events and being inherently speculative in nature, are not actionable as matter of law. Even with the defendants' knowledge of the adverse occurrences at Fairhaven and the uncertainties surrounding other projects, stock prices are influenced by a multitude of factors of which the defendants cannot be said on this record to have had superior knowledge. See *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App. Ct. 73, 78 (1994).

(4) *Management problems.* Two things are salient here: the plaintiffs made decisions to buy and hold stock at times (a) when they had no information either as to cofounder Davis's departure or as to cofounder Rosen's defalcations and subsequent forced resignation, and (b) when they knew of and inquired about the departures, but were provided with false and misleading information. The defendants maintain that they had no duty at any time to disclose such information.

To the extent that the claim involves nondisclosure of a fact, it is actionable as fraud only when there is a duty to disclose. *Wolf* v. *Prudential-Bache Sec., Inc.*, 41 Mass. App. Ct. 474, 476 (1996). We have recognized a duty to disclose where (i) there is a fiduciary or other similar relation of trust and confidence, (ii) there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading, or (iii) the nondisclosed fact is basic to, or goes to the essence of, the transaction. *Id.* at 476-77. Restatement (Second) of Torts § 551 (1977).

The duty to disclose arose here no later than when Stolzoff and Wilstein made specific inquiry about the founders' departures and were met with, at best, half-truths and misleading assurances and information. See *Maxwell* v. *Ratcliffe*, 356 Mass. 560, 562-563 (1969). The materiality of the nondisclo-

sures[19] to the plaintiffs' decisions and the reasonableness of the plaintiffs' reliance on what was told them regarding the departures is for a fact finder to determine.

2. *The claims asserted by the Wilstein nephews.* The motion judge dismissed all claims brought by the Wilstein nephews against all defendants, on the grounds that they did not meet the particularity requirement of Mass.R.Civ.P. 9(b). Apart from the fact that this pleading requirement has no application to anything other than their fraud (and, for the sake of argument, their misrepresentation) claims, dismissal was unwarranted.

The defendants point to these plaintiffs' failure to particularize the specific representations that were conveyed to them and when they were made. The five plaintiffs alleged in their complaint, however, that in the summer of 1995, Wilstein told Matulich and Rosen that he was going to recommend to his brother and nephews that they invest in the company; that they would rely on information that the defendants provided to Wilstein; and that he had shared and would continue to share such information with them. Wilstein's allegations of fraud are themselves of considerable specificity. To the extent that the complaint does not make clear that Wilstein acted as agent for his relatives or that Wilstein's brother acted as agent for the Wilstein nephews in effecting the purchases in their accounts with their consent, leave to amend the complaint should be granted. See *Friedman* v. *Jablonski*, 371 Mass. 482, 488 (1976).

3. *The claims against Strauss.* The judge dismissed all claims brought against Strauss because the fraud claim was insufficiently particularized. While we agree that what was alleged against him (his participation in the preparation of false and misleading company prospectuses and materials and the making of affirmative misrepresentations concerning Rosen's departure)

---

[19]The company brought an arbitration proceeding against Rosen for his misappropriations and sought to impound the pleadings because it feared they would have a materially adverse effect on the price of its stock. This, coupled with information in the February, 1995, private placement memorandum, the June, 1995, registration statement and the September, 1995, offering memorandum to the effect that the departure of, first, Davis and Rosen, and then Rosen alone, would be materially adverse to the company, precludes summary judgment on the point.

falls somewhat short of rule 9(b) requirements, in the circumstances,[20] the interests of justice would be better served if the plaintiffs were given leave, as they requested, to amend their fraud claims against Strauss.

4. *The Sachem entities.* The judge also dismissed all claims brought against the Sachem entities on rule 9(b) grounds. This was error. All of the misrepresentations attributed to Matulich, Koenig, and Hollander took place while they were soliciting investments in the company, thereby acting within the scope of their employment by the Sachem entities. See *Wang Labs., Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 859 (1986). The plaintiffs identified which particular Sachem entity served as the company's investment banker at each particular time in the relevant period, and the specific misrepresentations can thus be attributed to the investment banking entity for which the individuals then worked.

5. *The G. L. c. 93A claims.* All of the plaintiffs brought claims against all of the defendants pursuant to G. L. c. 93A. The dismissal of all such claims was error for the reason, if no other, that where, as here, the plaintiffs have viable claims for fraud and negligent misrepresentation, their chapter 93A claims based on the same misrepresentations and omissions withstand a motion for summary judgment. *Nota Constr. Corp.* v. *Keyes Assocs., Inc.*, 45 Mass. App. Ct. 15, 21 (1998).

6. *Uniform Securities Act claims.* Plaintiffs Stolzoff and Wilstein brought claims pursuant to G. L. c. 110A, § 410(*a*)(2), against the company, Davis, and Sachem; they brought claims pursuant to G. L. c. 110A, § 410(*b*), against defendants Rosen, Davis, Matulich, Koenig, Hollander, CGI, and Sachem. These claims apply to purchases made by Stolzoff and Wilstein in the March, 1995, private placement, and purchases by Stolzoff from Davis in August, 1995. The motion judge did not specifically discuss these claims. Within the pertinent time frame, the same representations that form the basis of actionable fraud and negligent misrepresentation claims also survive as to the G. L.

---

[20]See note 6, *supra.*

c. 110A, § 410(*a*)(2), and G. L. c. 110A, § 410(*b*), claims.[21],[22] However, the § 410(*b*) claim against CGI cannot stand, as the plaintiffs made no allegations that would hold it liable on this claim.[23]

7. *Hollander's motion to dismiss.* It was error for the motion judge to allow Hollander's motion to dismiss for lack of personal jurisdiction because the motion had been withdrawn and the record does not support allowing it.

*Disposition.* The judgment dismissing the claim against CGI pursuant to G. L. c. 110A, § 410(*b*) (count IV of the amended complaint) is affirmed. In all other respects, the judgment in favor of the defendants is vacated, and we remand the matter to the Superior Court for further proceedings not inconsistent with this opinion.

*So ordered.*

---

[21]In order to establish a claim under G. L. c. 110A, § 410(*a*)(2), "a plaintiff must show that (1) the defendant was a 'seller', (2) the defendant made a material misstatement and/or omission, and (3) the defendant was negligent with respect to the misstatement or omission." *Adams* v. *Hyannis Harborview, Inc.*, 838 F. Supp. 676, 686 (D. Mass. 1993), aff'd in part sub nom. *Adams* v. *Zimmerman*, 73 F.3d 1164 (1st Cir. 1996).

Liability as a seller under § 410(*a*)(2) of the Uniform Securities Act "extends only to the person who successfully solicits the purchase motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Adams* v. *Hyannis Harborview, Inc.*, 838 F. Supp. at 686, quoting from *Pinter* v. *Dahl*, 486 U.S. 622, 647 (1988). All three of the defendants named in this claim are sellers within this definition.

[22]Koenig, Hollander, and Matulich were all officers of Sachem, which was a "seller" of the company's securities at the time of the March, 1995, private placement. These three individuals are therefore subject to liability under § 410(*b*) if Sachem is liable under § 410(*a*)(2). Rosen, Davis, and Matulich were officers of the company, and are therefore subject to liability under § 410(*b*) if the company is liable under § 410(*a*)(2).

The analysis as to which representations are actionable as material misstatements is the same as in the common-law claims. See *Adams, supra* at 694-695. However, § 410(*a*)(2) also recognizes a cause of action for material omissions, which differs from a fraud claim, where nondisclosures are only actionable if there is a duty to disclose.

[23]The plaintiffs have made no allegations that CGI was involved in the private placement or sale of Davis's stock as an agent or broker-dealer, or that it controlled any of the defendants that were named in the § 410(*a*)(2) claims. CGI did not provide investment banking services to the company until September, 1995, after both purchases made in the private placement and sale of Davis's stock had occurred.

APPENDIX A.

SUMMARY OF PLAINTIFFS' STOCK PURCHASES

| DATE | NAME(S) | SECURITIES PURCHASED |
|---|---|---|
| March 28, 1995 | Stolzoff | 85,000 shares and 42,500 warrants |
| March 28, 1995 | D. Wilstein | 22,500 shares and 11,250 warrants |
| May/June, 1995 | D. Wilstein | 10,000 shares |
| July, 1995 | L. Wilstein | 2,500 shares |
| July, 1995 | R. Wilstein | 1,250 shares |
| July, 1995 | G. Wilstein | 1,250 shares |
| August, 1995 | D. Wilstein | 5,000 shares |
| August, 1995 | L. Wilstein | 7,500 shares |
| August, 1995 | G. Wilstein | 1,250 shares |
| August, 1995 | R. Wilstein | 1,250 shares |
| August, 1995 | Stolzoff | 25,000 shares |
| August, 1995 | Stolzoff | 50,000 shares |
| November 8-9, 1995 | Stolzoff | 2,000 shares |
| December 1-15, 1995 | L. Wilstein G. Wilstein R. Wilstein | 50,000 shares |
| December 5-19, 1995 | D. Wilstein | 57,000 shares and 33,750 warrants |
| Jan./Feb., 1996 | D. Wilstein | 3,500 shares and 45,750 warrants |
| Jan./Feb., 1996 | L. Wilstein G. Wilstein R. Wilstein | 30,750 warrants |
| May 8-June 27, 1996 | Stolzoff | 13,000 shares |
| June 3-12, 1996 | D. Wilstein | 36,000 shares |
| June/July, 1996 | L. Wilstein G. Wilstein R. Wilstein | 35,000 shares |
| August 7, 1996 | Stolzoff | 6,000 shares |
| August 9-16, 1996 | D. Wilstein | 51,000 shares |

| DATE | NAME(S) | SECURITIES PURCHASED |
|---|---|---|
| August 9, 1996 | L. Wilstein | 25,000 shares |
| October 3-8, 1996 | L. Wilstein | 5,000 shares |
| Jan./Feb., 1997 | L. Wilstein<br>R. Wilstein<br>G. Wilstein | 52,000 shares |