# United States Court of Appeals

## For the First Circuit

No. 01-1217

HARVEY D. WOLINETZ,

Plaintiff, Appellant,

v.

BERKSHIRE LIFE INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Boudin, Chief Judge,

Baldock,* Senior Circuit Judge, and

Howard, Circuit Judge.

    Douglas M. Brooks with whom Gilman and Pastor, LLP, Patrick F.
Morris, Morris and Morris, LLC, Michael B. Hyman, William H. London
and Much Shelist Freed Denenberg Ament & Rubenstein, P.C. were on
brief, for appellant.
    John A. Shope with whom Michael B. Keating, Kirk G. Hanson and
Foley Hoag LLP were on brief, for appellee.

March 18, 2004

*Of the Tenth Circuit, sitting by designation.

**HOWARD**, <u>**Circuit Judge**</u>.  In this case, we consider whether the district court correctly entered summary judgment dismissing Harvey Wolinetz's fraud-related claims against Berkshire Life Insurance Company on statute of limitations grounds.  Because we conclude that the date on which Wolinetz learned or should have learned of his claims against Berkshire presents a jury question, we vacate and remand for further proceedings.

## I. <u>Background</u>

This case concerns a vanishing premium life insurance policy that Wolinetz purchased from Berkshire.  This type of policy provides that the insured pays the insurer a certain number of premiums before the policy becomes self-funding.  The policy is marketed on the premise that enough cash value will accumulate over a limited period so that, on a fixed date, future premiums will be paid by the policy's accumulated value rather than by the insured. The speed with which the cash value increases depends on prevailing interest rates and the success of the insurer's investments.  High interest rates and successful investments result in the policy becoming self-funding at an earlier date.

In 1987, Wolinetz contacted Richard Lewis, a Berkshire agent, to discuss purchasing life insurance.  Lewis encouraged Wolinetz to purchase a vanishing premium policy with a $3 million death benefit.  Lewis explained to Wolinetz that, after paying fourteen yearly premiums of $20,000, the policy would become self-

funding.  As part of his presentation, Lewis showed Wolinetz an illustration (the "original illustration") confirming that, based on current performance and expected interest rates and dividends, the policy would become self-funding after fourteen years.  In addition to this projection, the original illustration contained a disclaimer which stated:

> Dividends and, if applicable, interest rates and dividend purchases are neither estimated nor guaranteed but are based on current scales . . . Dividends are dependent on investment earnings, mortality experience and expenses. . . The current dividend scale is interest sensitive which means significant changes in interest rates may affect future earnings.

Thus, the original illustration disclosed to Wolinetz that the fourteen-year premium promise was based, in part, on predictions about future events and therefore not guaranteed.

On December 2, 1987, Wolinetz signed the policy application.  Berkshire mailed Wolinetz his policy in the fall of 1988.  The policy stated that premiums could be payable for life; nowhere did the policy guarantee a dividend or interest rate.

Beginning in 1991, Wolinetz received annual reports from Berkshire indicating that his policy was underperforming.  Each report announced a reduction in Berkshire's dividends.  These reports also provided reasons for the poor performance grounded in changes in the economic environment.  For example, the 1991 report stated, "[M]ost, if not all, major insurance companies in the United States reduced their dividends during 1991, Berkshire among

-3-

them.   And with good reason, primarily reflecting the lower earnings available in the marketplace, but also reflecting the impact of new federal taxation of life insurers."  Similarly, the 1993 report announced falling dividends because "[l]ow interest rates have forced well-reputed mutual life insurance companies, including Berkshire, to reduce their dividend scales."

In addition to these annual reports, Wolinetz received individual policy statements showing lower than projected dividends during the 1991-1994 period.  During this same period, Wolinetz also received cash value statements showing lower than expected cash values for his policy.  Finally, in 1992 and 1994, Wolinetz received two form letters from Berkshire's president stating that vanishing premium policyholders may be required to pay additional future premiums because of falling dividends.

In May 1996, a broker from another insurer approached Wolinetz to sell him more life insurance.  As part of his discussions with this agent, Wolinetz provided a copy of his Berkshire policy, the original illustration, and the other materials that he had received from Berkshire.  After reviewing these materials, the agent told Wolinetz that the Berkshire agent's prognostications about vanishing premiums was incorrect and that under current conditions, Wolinetz would have to pay an annual premium of $37,000 for nineteen years for the policy to become self-funding.

In light of this information, on August 20, 1997, Wolinetz sued Berkshire in the United States District Court for the Southern District of New York. Wolinetz asserted several claims against Berkshire: fraud, fraudulent inducement, negligent supervision, unjust enrichment, imposition of a constructive trust, breach of contract, breach of the covenant of good faith and fair dealing, and violation of Mass. Gen. L. ch. 93A.

Wolinetz's complaint pled two theories of liability. His contract claims alleged that Berkshire broke its guarantee that his policy would become self-funding after fourteen annual premiums. Wolinetz's tort and ch. 93A claims alleged that Berkshire used fraudulent information to produce the original illustration which induced him to purchase the policy.

On October 27, 1997, Wolinetz's case was transferred to the District of Massachusetts. See 28 U.S.C. § 1404(a). On October 6, 1998, Wolinetz filed a First Amended Complaint and Consolidated Class Action Complaint, which Berkshire moved to dismiss. See Fed. R. Civ. P. 12(b)(6). On May 25, 1999, the district court dismissed the contract claims but permitted the tort and ch. 93A claims to proceed. On June 22, 1999, the court ordered that discovery be limited to "the statute of limitations issue." After preliminary discovery, Berkshire moved for summary judgment on the ground that Wolinetz's claims were untimely. On December 12, 2000, the district court granted Berkshire's motion and entered

judgment in its favor.  Wolinetz appealed.

## II. Standard of Review

We review the district court's summary judgment ruling de novo.  See Rosenberg v. Everett, 328 F.3d 12, 17 (1st Cir. 2003).  We consider all evidence in the record and accord Wolinetz all reasonable inferences supported by the evidence.  Id.  We will affirm the district court's ruling if "the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that [Berkshire] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

## III. Discussion

Before addressing the parties' arguments, we emphasize the theory of liability at issue in this appeal.  Wolinetz no longer pursues his contract claims which the district court dismissed.  As Wolinetz conceded at the summary judgment argument, the only potentially viable claims arise from his contention that the original illustration contained fraudulent data on which he reasonably relied in purchasing his policy.  See Cooper v. Berkshire Life Ins. Co., 810 A.2d 1045, 1058-62 (Md. App. Ct. 2002) (distinguishing between "guaranteed premium" claim and "fraudulent illustration" claim).  Thus, we focus only on whether Wolinetz's fraudulent illustration claims are untimely.  The parties agree that Massachusetts law governs the statute of limitations issue.

Wolinetz has pled several common law tort claims which are subject to a three-year limitations period. See Mass. Gen. L. ch. 260, § 2a.[1] He has also pled a Mass. Gen. L. ch. 93A claim which is subject to a four-year limitations period. See Mass. Gen. L. ch. 93A, § 9. Wolinetz filed suit on August 20, 1997. Generally, the limitations period begins when the plaintiff suffers an injury, see Taygeta Corp. v. Varian Assocs., Inc., 763 N.E.2d 1053, 1063 (Mass. 2002), which would be December 2, 1987, the date on which Wolinetz purchased the policy from Berkshire. If Wolinetz's claims accrued on this date, his suit would be untimely. Wolinetz contends, however, that because his fraudulent illustration claim was inherently unknowable when he purchased the policy, the discovery rule tolls the running of the limitations period until May 1996, when the insurance broker reviewed his Berkshire policy and the accompanying materials.

Massachusetts recognizes a "discovery rule" that tolls the running of the limitations period in certain circumstances. See Franklin v. Albert, 411 N.E.2d 458, 463 (Mass. 1980); see also Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 560

---

[1] Berkshire argues that, because this suit involves the sale of life insurance, a two-year limitations period applies. See Mass. Gen. L. ch. 175, § 181. This argument was not raised below and cannot be debuted here. See Amcel Corp. v. Int'l Executive Sales, Inc., 170 F.3d 32, 35 (1st Cir. 1999). In any event, as discussed infra, because we cannot determine as a matter of law the date on which Wolinetz's claims accrued, applying a two-year statute of limitations would not change the result.

N.E.2d 122, 125-26 (Mass. App. Ct. 1990) (holding that discovery rule applies in Mass. Gen. L. ch. 93A actions). Under this rule, "a cause of action . . . does not accrue until the plaintiff knew, or in the exercise of reasonable diligence should have known of the factual basis for his cause of action." Patsos v. First Albany Corp., 741 N.E.2d 841, 846 (Mass. 2001). For a plaintiff to have sufficient information to trigger the limitations period, he need not know every fact required to prevail on his claim. See Riley v. Presnell, 565 N.E.2d 780, 784 (Mass. 1991). It is sufficient that the plaintiff has enough information to suggest that he has suffered an injury caused by the defendant's conduct. See Int'l Mobiles, 560 N.E.2d at 124. Thus, if a plaintiff has information suggesting an injury caused by the defendant, he is deemed to be on "inquiry notice" of his claim. See Pagliuca v. Boston, 626 N.E.2d 625, 628 (Mass. App. Ct. 1994). Factual disputes concerning the date on which the plaintiff knew or should have known of his cause(s) of action are resolved by a jury. See Riley, 565 N.E.2d at 787 ("[W]here . . the plaintiff has claimed a trial by jury, any disputed issues relative to the statute of limitations ought to be decided by the jury.").

In fraud litigation over a failed investment, a plaintiff is under inquiry notice when he is aware of "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved

in the sale" of the investment. <u>Kennedy</u> v. <u>Josephthal & Co.</u>, 814 F.2d 798, 802 (1st Cir. 1987). Such storm warnings must be sufficiently clear to alert the plaintiff to the possibility of fraud but need not provide a "full exposition of the scam." <u>Id.</u>

Berkshire claims that Wolinetz received such "sufficient storm warnings" outside the applicable limitations periods. Specifically, Berkshire contends that the following information was sufficient to place Wolinetz on inquiry notice of his fraudulent illustration claim: (1) the policy and original illustration disclaimers issued in 1987-1988; (2) the annual reports issued between 1991 and 1994; (3) the cash value and dividend statements issued between 1991 and 1994; and (4) the two form letters issued in 1992 and 1994 stating that vanishing premium policyholders may have to pay additional premiums. We do not agree that this information is sufficient to resolve the statute of limitations question as a matter of law.

When Wolinetz first discussed the policy with Lewis, Lewis told him, based on the information provided in the original illustration, that he would have to pay only fourteen years of premiums. However, this original illustration contained a disclaimer explaining that, if interest rates and dividends did not meet expectations, a policyholder could have to pay additional premiums. This message was reinforced by the policy language itself, which informed Wolinetz that premiums could be payable for

-9-

life.   Thus, on purchasing the policy, Wolinetz knew that the fourteen-year premium promise was not guaranteed but was contingent on future economic conditions.   Nothing in these documents suggested to him, however, that the original illustration based the initial fourteen-year premium promise on fraudulent data.[2]

The other notices mentioned by Berkshire only restated what Wolinetz already knew--i.e., that the vanishing premium guarantee was dependent on future events.  The annual reports for 1991, 1992, and 1993 announced declines in company dividends. These reports provided reasons for the declines unrelated to the data used to create the original illustration.  The 1992 report blamed the decline on changes in federal tax law and the 1993 report blamed the decline on lower than expected interest rates. Similarly, the cash value and annual dividend statements informed Wolinetz that his policy was underperforming, but they did not suggest to him that the poor performance was the result of false initial information.  The form letters from Berkshire's president also did not blame the information in the original illustration for the policy's poor results.

When Wolinetz purchased the policy from Berkshire, he knew that policy dividends could decline.  Berkshire's subsequent

_____

[2] Because the parties have not conducted discovery on the merits, we assume at this stage the veracity of Wolinetz's allegation that the original illustration was premised on fraudulent data.

notices informed Wolinetz of only two additional facts: (1) dividends were in fact declining and (2) the decline was the result of changes in the tax law and business climate. Thus, Berkshire's notices, taken in total, informed Wolinetz only that his vanishing premium policy was underperforming because of recent economic developments--a result he knew could occur without Berkshire committing fraud. Under Massachusetts law, information provided to an investor showing that his investment is not meeting expectations does not necessarily place the investor on notice of a potential fraud claim against the seller. See Stolzoff v. Waste Sys. Int'l, Inc., 792 N.E.2d 1031, 1040 (Mass. App. Ct. 2003) ("While the steady dip in stock price may well have raised some red flags about the company's vitality, stock prices falter for many non-fraudulent reasons, and it cannot be said as a matter of law that the plaintiffs must have . . . reasonably drawn the conclusion that they had been defrauded."). Therefore, we hold that the information Wolinetz received showing that his policy was underperforming was not sufficiently suggestive of fraud to determine the date on which his claims against Berkshire accrued.[3]

---

[3] Berkshire also contends that if Wolinetz had undertaken an investigation when he learned that the premium guarantee was false, he could have discovered the alleged fraudulent illustration. We are unpersuaded. Because the premium promise was not guaranteed, a reasonable investor would not necessarily investigate fraud in the original promotional materials when he learned that the premium promise would not be met, especially where the insurer provided other plausible reasons for the failure of the policy to meet expectations.

See Taygeta Corp., 763 N.E.2d at 1063 ("In most cases, the question when a plaintiff knew or should have known of its cause of action is one of fact that will be decided by the trier of fact.").[4]

Berkshire relies on our recent decision in In Re New England Life Ins. Co. Sales Practices Lit., 346 F.3d 218 (1st Cir. 2003), for support. There we held that, under Kansas law, the plaintiffs had sufficient notice of their claims against the insurer to trigger the limitations period when they received notification that they would have to pay premiums beyond the promised vanishing point. Id. at 221. This case is distinguishable from In Re New England on at least two bases. First, Wolinetz never received notification from Berkshire that he would have to pay additional premiums. The only notice that he received was a form letter stating that he may have to pay additional future premiums. Second, the In Re New England decision does not suggest that the plaintiffs received plausible explanations for the decline in interest rates. Id. at 220-21. Unlike In Re New England, Berkshire told Wolinetz that the declines were the result of changes in the tax laws and business climate.

_____

[4] The parties argue extensively about the application of the Massachusetts Appeal Court's opinion in Szymanski v. Boston Mutual Life Ins. Co., 778 N.E.2d 16 (Mass. App. Ct. 2002). While certainly not contrary to the result we reach, it is not particularly helpful to our analysis. Szymanksi considered a statute of limitations question in a guaranteed premium case. The quantum and sorts of information that would establish inquiry notice in a guaranteed premium case are different than what would establish inquiry notice in a fraudulent illustration case.

A jury could conclude that these plausible explanations for the declines may have reasonably dissuaded Wolinetz from investigating possible fraud by Berkshire. Cf. Rodriguez-Suris v. Montesinos, 123 F.3d 10, 16 (1st Cir. 1997) ("If a plaintiff's suspicions that she may have been the victim of a tort are assuaged by assurances made by the person who caused the injury, a plaintiff will not be held responsible for failing to pursue her claim more aggressively.").

Before closing, we offer two observations. First, a fraudulent illustration claim, such as Wolinetz raises here, would not always trump a contention that later events departing from the projections constituted inquiry notice. Deviations between the projections and what actually occurred could be sufficiently remarkable that a reasonable person would have had to suspect the possibility that the projections were fraudulent, thereby triggering inquiry notice. But here, if Wolinetz was misled by the allegedly fraudulent illustration, there is, on these facts, a jury issue as to whether the subsequent letters put him on reasonable notice.

Second, in his own deposition, Wolinetz seemingly said-- in support of his contract claims--that he understood the policy to guarantee him that the premiums would disappear after 14 years. The implication is that he relied not on the reasonableness of the projections but on his understanding that (regardless of the

economic conditions) the insurer was guaranteeing that payments would vanish after 14 years. This raises a question as to whether Wolinetz will be able to satisfy the reliance requirement that is a necessary element of his fraudulent illustration claim.

## IV. **Conclusion**

For the reasons set forth above, we conclude that the date on which Wolinetz's claims against Berkshire accrued presents a jury question. Accordingly, we **vacate** the judgment of the district court and **remand** the case for further proceedings consistent with this opinion.

**So ordered**.