| | | |
|---|---|---|
| **MARIA ASSUNTA DEL VESCOVO, GIULIA NASINI, GIULIANO NASINI AND MARIA NASINI, INDIVIDUALLY AND ON BEHALF OF THEIR DECEASED HUSBAND AND FATHER, RESPECTIVELY, SERGIO NASINI** | \* <br><br> \* <br><br> \* <br><br> \* <br><br> \* \* \* \* \* \* \* | **NO. 2023-CA-0116** <br><br> **COURT OF APPEAL** <br><br> **FOURTH CIRCUIT** <br><br> **STATE OF LOUISIANA** |

**VERSUS**

**AIR & LIQUID SYSTEMS CORPORATION (SUED INDIVIDUALLY AND AS SUCCESSOR-BY-MERGER TO BUFFALO PUMPS, INC.), ET AL.**

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2021-07287, DIVISION "G-11"
Honorable Robin M. Giarrusso, Judge
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*

(Court composed of Judge Rosemary Ledet, Judge Dale N. Atkins, Judge Nakisha Ervin-Knott)

Michael L. Armitage
Susannah B. Chester-Schindler
A. Edward Cangelosi
WATERS KRAUS & PAUL
3141 Hood Street, Suite 200
Dallas, TX 75219

     COUNSEL FOR PLAINTIFFS/APPELLANTS, Maria Assunta del Vescovo, Giulia Nasini, Giuliano Nasini, and Maria Nasini

Stacey L. Strain
HUBBARD, MITCHELL, WILLIAMS & STRAIN, PLLC
1062 Highland Colony Parkway, Suite 222
Ridgeland, MS 39157

COUNSEL FOR DEFENDANT/APPELLEE, Air & Liquid Systems Corp., (sued individually and as successor-by-merger to Buffalo Pumps, Inc.)

COUNSEL FOR DEFENDANT/APPELLEE, Flowserve US Inc. (sued individually and as successor-in-interest to Aldrich Pump Company and as successor-in-interest to Edward Valves, Inc.)

Tim Gray
Michael H. Abraham
Melissa D. Fuller
Elizabeth R. Penn
McCann E. Lefeve
Chelsea Gaudin Favret
FORMAN WATKINS & KRUTZ LLP
201 St. Charles Avenue, Suite 2100
New Orleans, LA 70170

COUNSEL FOR DEFENDANT/APPELLEE, Chevron Shipping Company, LLC

Susan B. Kohn
Douglas R. Kinler
Douglas W. Redfearn
SIMON, PERAGINE, SMITH & REDFEARN LLP
1100 Poydras Street, 30th Floor
New Orleans, LA 70163

COUNSEL FOR DEFENDANT/APPELLEE, Eagle, Inc.

Byron D. Kitchens
Margaret W. McLaughlin
FORMAN WATKINS & KRUTZ LLP
201 St. Charles Avenue, Suite 2100
New Orleans, LA 70170

COUNSEL FOR DEFENDANT/APPELLEE, Marathon Oil Company

John J. Hainkel, III
Angela M. Bowlin
Benjamin M. Castoriano
Roth M. Hainkel
Gillis W.P. Klotz
FRILOT L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, LA 70163

COUNSEL FOR DEFENDANT/APPELLEE, Occidental Petroleum Corporation

C. Kelly Lightfoot
Edward J. Lassus, Jr.
3445 North Causeway Boulevard, Suite 800
Metairie, LA 70002
P.O. Box 8288
Metairie, LA 70011

COUNSEL FOR DEFENDANT/APPELLEE, Taylor-Seidenbach, Inc.

Scott C. Barney
Nicole C. Katz
Jesse G. Frank
CHAFFE McCALL, L.L.P.
8550 United Plaza Boulevard, Suite 103
Baton Rouge, LA 70809

COUNSEL FOR DEFENDANT/APPELLEE, United States Steel Corporation

**AFFIRMED**
**November 15, 2023**

This is a Jones Act and general maritime case. Appellants, Maria Assunta del[1] Vescovo, Giulia Nasini, Giuliano Nasini, and Maria Nasini (collectively "Appellants"),[2] seek review of the trial court's October 10, 2022 judgment, which granted an exception of prescription in favor of Air & Liquid Systems Corporation ("Air & Liquid Systems"), Chevron Shipping Company LLC ("Chevron"), Eagle Inc. ("Eagle"), Flowserve US Inc. ("Flowserve"), Marathon Oil Company ("Marathon"), Occidental Petroleum Corporation ("Occidental"), Taylor-Seidenbach Inc. ("Taylor-Seidenbach"), and United States Steel Corporation ("United States Steel") (collectively "Appellees").[3] The judgment also dismissed Appellants' claims with prejudice. For the following reasons, we affirm.

---

[1] The spelling "Del" also appears in the record. Because Maria Nasini utilized the spelling "del" in her affidavit, which is discussed more fully throughout this Opinion, we will also use the spelling "del."

[2] As some Appellants share the same first name (e.g., Maria Assunta del Vescovo and Maria Nasini) and some Appellants share the same last name because they are family members, this Opinion will use their full names throughout for ease of understanding.

[3] As explained more fully throughout this Opinion, the October 10, 2022 judgment specifically mentioned the "Renewed Peremptory Exception of Prescription" filed by Marathon and Chevron on August 4, 2022. After Marathon and Chevron filed their Renewed Peremptory Exception of Prescription, Air & Liquid Systems, Eagle, Flowserve, Occidental, and Taylor-Seidenbach each

**RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

*Original Petition for Damages*

On August 27, 2021, Appellants, individually and on behalf of their deceased husband and father, respectively, Sergio Nasini,[4] filed an Original Petition for Damages ("Original Petition") in Orleans Civil District Court. The Original Petition explained that Appellants are residents of and domiciled in Italy. Regarding Sergio Nasini, the Original Petition alleged that he was diagnosed with malignant mesothelioma ("mesothelioma") in May 2012. Further, the Petition contended:

> Petitioner Sergio Nasini's death on June 8, 2013[,] was due to or a consequence of his exposure to dust and fibers from asbestos and/or asbestos-containing materials; as a direct and proximate result or consequence of his exposure aboard vessels in navigation, including on the navigable waters of the United States, to dust and fibers from asbestos and/or asbestos-containing materials that occurred aboard the oceangoing vessels owned, managed and/or operated by various Defendants identified in this Petition; and as a further direct and proximate result of his exposure to asbestos products and equipment manufactured by other Defendants named herein that were unreasonably dangerous per se; defective in composition or construction; defective in design; lacking suitable warnings or instructions concerning the hazards presented; as a result of negligent, willful, and/or reckless misconduct; and as a result of intentional misconduct of certain of the Defendants . . . .

---

separately filed motions to join in and adopt the exception; and the trial court granted all of their motions. Based on the record before this Court, United States Steel did not file such a motion. Nonetheless, the trial court rendered the October 10, 2022 judgment in favor of United States Steel too, and United States Steel appears before us in the capacity of an appellee.

[4] See the explanation in footnote 1 regarding the use of Appellants' full names. Likewise, this Opinion will use the full name "Sergio Nasini" to avoid confusion.

Sergio Nasini was the husband of Maria Assunta del Vescovo and the father of Maria Nasini, Giuliano Nasini, and Giulia Nasini.

Appellants contended in the Original Petition that they first learned that asbestos exposure was a substantial contributing factor in the development of Sergio Nasini's mesothelioma in late 2020/early 2021.

In pertinent part, identified as defendants were Air & Liquid Systems; Chevron; Eagle; Flowserve; Marathon; Occidental; Taylor-Seidenbach; and United States Steel Corporation.

***First Exception of Prescription***

On April 1, 2022, Marathon filed an Exception of Prescription ("First Exception"). Therein, Marathon contended that Appellants' claims had prescribed under both federal maritime and Louisiana laws.[5] At the outset, Marathon asserted that under both maritime and state law cases, the burden of pleading and proving facts to support an interruption of prescription was on Appellants. Marathon noted that Appellants pled the "discovery rule" in their Original Petition (i.e., Appellants alleged that prescription did not begin to run until Appellants "first learned" that Sergio Nasini's mesothelioma was related to asbestos in "late 2020/early 2021," which was eight to nine years after his mesothelioma diagnosis and resulting death). However, Marathon countered that the "discovery rule" exception to federal statutes of limitations and the *contra non valentem* exception to Louisiana's

_____

[5] In its Exception of Prescription, Marathon cited the three-year prescriptive period found in 46 U.S.C. § 30106 and the one-year prescriptive period located in La. C.C. arts. 2315.1 and 2315.2.

Marathon also stated in its Exception of Prescription that it was "not conced[ing] or advocate[ing] that U.S. maritime law or Louisiana law should apply to this matter. Rather, it merely addresse[d] the law that Plaintiffs allege[d] in their petition." Marathon further noted that "[a]t this early stage in the litigation, it is difficult to assess the choice-of-law factors with the detailed analysis required under maritime law;" however, Marathon also observed that "a finding that the claims are prescribed would moot any further [choice of law] analysis."

prescriptive statutes were inapplicable because Appellants had failed to investigate their claims with the necessary "reasonable diligence."

Specifically, Marathon argued that prescription began to run when Appellants had a reasonable opportunity to discover the cause of Sergio Nasini's illness. To this end, Marathon stated that mesothelioma is a "signature disease" that "is so causally related to asbestos exposure that any type of investigation would have alerted [Sergio] Nasini and/or [Appellants] to that causal association immediately upon his mesothelioma diagnosis in May 2012." Further, Marathon argued that "[t]he hazards of asbestos, including specifically mesothelioma, have been well-known in Italy," including in the region where Sergio Nasini and Appellants lived. Marathon argued that if the trial court permitted Appellants' case to proceed, it would present significant prejudice to Appellees and undermine the legislative goal of prescription statutes. Another Appellee, Chevron, filed a "Motion to Join and Adopt Marathon['s] . . . Peremptory Exception of Prescription" on April 20, 2022, which the trial court granted that same day.

The next day, April 21, 2022, Appellants filed an "Opposition . . . to Exception of Prescription" ("Opposition to the First Exception"). Therein, they contended that Appellees had not established that Appellants' claims were prescribed because "the [Original] [P]etition states plainly that '[i]n late 2020/early 2021, plaintiffs first learned, and now allege, that asbestos exposure was a substantial contributing factor in the development of [Sergio] Nasini's mesothelioma.' That statement shows that [the statute of] limitations [or prescription] did not begin to run until late 2020 at the earliest, and must be taken as true."

4

Appellants attached to their Opposition to the First Exception an April 20, 2022 affidavit from Maria Nasini. Therein, Maria Nasini identified herself as the oldest child of Sergio Nasini and Maria Assunta del Vescovo. In the affidavit, she also stated, in pertinent part:

> 5. I generally recall that my father underwent a biopsy in the spring of 2012. Most likely this was in May 2012, to the best of my recollection. This led to a diagnosis of malignant mesothelioma being made. I do not remember the name of the doctor who made the diagnosis. I had never heard of the disease before.
>
> 6. Upon information and belief, my father Sergio Nasini learned of his diagnosis around May 2012.
>
> 7. No one ever explained the cause of my father's illness to us. No medical professional ever even asked questions about a potential cause in my presence, and I accompanied my father to a lot of his medical appointments. . . . Again, no doctor in my presence ever asked about asbestos, smoking or any other cause of the cancer. My father also never mentioned to me that a doctor had discussed the cause of his cancer with him outside my presence.
>
> 8. Among the five of us, no one wondered out loud what caused my father's illness diagnosed in 2012. No one asked or raised the issue of a cause in my presence. They discussed only that he had a tumor in his lung.

Additionally, Appellants attached to their Opposition to the First Exception an April 20, 2022 affidavit from Pierpaolo Petruzzelli ("Mr. Petruzzelli"), who identified himself as a "lawyer admitted to practice before the highest court in the Republic of Italy" and stated that he "helped [his] American co-counsel obtain [Maria Nasini's affidavit] from her." Mr. Petruzzelli also stated that, at the time of his affidavit, he had been representing "Italian victims of asbestos disease for more than 20 years." In his affidavit, Mr. Petruzzelli attested that "the degree of general awareness of the Italian population in relation to the link between asbestos and the onset of certain asbestos diseases and pathologies is not to be considered either

widespread or exhaustive." Further, Mr. Petruzzelli stated that "[i]t ha[d] been [his] consistent experience as a practitioner in this field that the overwhelming majority of the clients who come to [him] for legal help arrive without any prior knowledge of the diseases that asbestos causes until shortly before contacting [him] for help."

After a hearing on First Exception, the trial court signed a judgment on May 10, 2022, which granted the First Exception but provided Appellants with sixty days to amend their petition.[6]

***Amended Petition***

On July 1, 2022, Appellants filed their "First Supplemental and Amending Petition for Damages" ("Amended Petition"). In pertinent part, the Amended Petition stated that "in August 2012, when her father's condition had worsened . . . Maria Nasini privately learn[ed] from a doctor that the biopsy had revealed that Sergio Nasini suffered from a tumor known as 'mesothelioma.'" Regarding Maria Assunta del Vescovo, the Amended Petition stated that she "first learned that her husband had an unspecified tumor" a few months before Sergio Nasini died but did not learn that he died of mesothelioma until Maria Nasini informed her "[i]n early 2021." According to the Amended Petition, "Giulia Nasini and Giuliano Nasini learned in 2012 that their father Sergio Nasini had been diagnosed with some type of tumor, but they never learned the name of the tumor, or the precise nature of [Sergio] Nasini's diagnosis, or that it had been caused by his prior asbestos exposure, until early 2021."

---

[6] Louisiana Code of Civil Procedure Article 934, which is titled "[e]ffect of sustaining peremptory exception," states, in pertinent part, that "[w]hen the grounds of the objection pleaded by the peremptory exception may be removed by amendment of the petition, the judgment sustaining the exception shall order such amendment within the delay allowed by the court."

Additionally, the Amended Petition explained that "[i]n approximately late 2020 or early 2021, Petitioner Maria Nasini learned, for the first time, via a radio program that the disease mesothelioma was caused by prior asbestos exposure." The Amended Petition stated that "[Maria Nasini] recalls that she did not pay much attention to this link at the time because she did not know or believe that her father had ever worked around asbestos." The Amended Petition also stated that "[l]ater, on approximately March 20, 2021, Petitioner Maria Nasini was at her place of employment" when she "ran into . . . a man she recognized as one of her father's former coworkers." The Amended Petition continued that after Maria Nasini told her father's former coworker that her father had died, the former coworker asked how Sergio Nasini had died. According to the Amended Petition, Maria Nasini explained "that Sergio Nasini's death was caused by a cancer known as mesothelioma." Further, the Amended Petition stated that the former coworker "replied that he was familiar with the disease and its cause, and told Maria Nasini that the ship he and her father had worked on together years earlier (an American oil tanker) was 'covered with asbestos.'" To this end, the Amended Petition further asserted:

> Not until late 2020/early 2021, did Petitioners first learn that asbestos exposure was a substantial contributing factor in the development of [Sergio] Nasini's mesothelioma. As set forth . . . Petitioners did not know nor could have reasonably known that [Sergio] Nasini's injuries were caused by his asbestos exposure at any time before then. Petitioners thus filed suit within three (3) years of the date of discovering that Decedent Sergio Nasini's injuries and death were asbestos-related and/or the existence of any asbestos-related causes of action, pursuant to 46 U.S.C. Section 30106.

In response to the Amended Petition, Marathon and Chevron filed a "Renewed Peremptory Exception of Prescription" ("Renewed Exception").

***Renewed Exception***

Marathon and Chevron filed their Renewed Exception on August 4, 2022. Therein, they asserted that Appellants' Amended Petition had failed to cure any of the issues raised in the previously-granted First Exception. In particular, the Renewed Exception acknowledged that a plaintiff can toll the running of a time limitation period by seeking to invoke the "discovery rule" but only if the plaintiff demonstrates that he or she tried to find out the cause of the injury at issue. In this regard, the Renewed Exception contended that the Amended Petition confirmed that Appellants knew of Sergio Nasini's mesothelioma diagnosis in 2012 but was silent as to a single affirmative step Appellants took or attempted to take to investigate the cause of his mesothelioma. Attached to the Renewed Exception were five exhibits:

- Defense Exhibit A: Transcript of the April 29, 2022 Hearing on the First Exception;

- Defense Exhibit B: a February 2, 2017 Petition filed in the Superior Court of the State of California for the County of Los Angeles, which was captioned *Antonio Buttaro and Concetta Padula vs. A.W. Chesterton Co., et al*;

- Defense Exhibit C: an April 11, 2018 Petition filed in The United States District Court for the District of Delaware, which was captioned *Pietro Vocciante and Rosalba v. Assante v. Air & Liquid Systems Corporation (sued individually and as successor by merger to Buffalo Pumps, Inc.), et al*;

- Defense Exhibit D: a November 13, 2017 article titled "Asbestos Ban in Italy: A Major Milestone, Not the Final Cut;" and

- Defense Exhibit E: an article in Italian, which is dated "13 Maggio 2012" and titled "Amianto, conto salato ai marittimi di Puglia centinaio di malati"

On September 19, 2022, Appellants filed an "Opposition to [the] Renewed Exception" ("Opposition to the Renewed Exception"), wherein they countered that the Renewed Exception "neither identified allegations in the complaint nor proved

that [Appellants] had reason to know of the connection between [Sergio] Nasini's mesothelioma and his workplace more than three years before this case was filed." Appellants contended that the basis of the argument in the Renewed Exception was that the fact of a mesothelioma diagnosis—without more—caused the claim to accrue and the statutory prescriptive period to begin running. Countering this, Appellants asserted that the United States Supreme Court's holding in *U.S. v. Kubrick* foreclosed that argument by holding that a claim does not accrue until the claimant is aware that he has suffered an injury; that he is aware of its cause; and that he is aware that he was hurt by another. 444 U.S. 111, 122, 100 S.Ct. 352, 359, 62 L.Ed.2d 259 (1979). In sum, Appellants contended that their claim did not begin to accrue until 2021 when they learned of the connection between mesothelioma and asbestos, as well as the connection between asbestos and Sergio Nasini's work history.

One of the exhibits that Appellants attached to their Opposition to the Renewed Exception was a 2021 research paper entitled "Awareness, Knowledge and Training Gaps Regarding Asbestos Among General Practitioners: a Pilot Study" ("2021 Research Paper"), which states that "[t]his pilot study addressed a sample of [general practitioners] in Molise region, central Italy." The 2021 Research Paper contains a table titled "Awareness on asbestos risk and [asbestos related diseases]." It states, in pertinent part:

| Item | Yes N (%) | No N (%) |
|---|---|---|
| Q1 Is asbestos exposure harmful for human health? | 28 (100) | 0 (0) |
| Q2 Does asbestos exposure in living and workplace environments increase risk of mesothelioma development? | 28 (100) | 0 (0) |
| . . . . | | |
| Q12 Is the latency period of mesothelioma typically longer than 25 years? | 11 (39.3) | 17 (60.7) |
| . . . . | | |
| Q16 Which diseases are associated with asbestos exposure? | | |
| . . . . | | |
| (a) Pulmonary asbestosis | 26 (92.8) | 2 (7.2) |
| . . . . | | |
| (c) Pleural[7] mesothelioma | 27 (96.4) | 1 (3.6) |

### Hearing on the Renewed Exception

Thereafter, on September 27, 2022, the trial court held a hearing on the Renewed Exception. In pertinent part, at the hearing, Appellants offered into evidence a May 2012 pathology report from San Paolo Hospital, Bari, Italy. Appellees offered two additional exhibits into evidence (that is, in addition to those aforementioned exhibits attached to their Renewed Exception):

---

[7] This Court can take judicial notice of government websites. *See State in Interest of K.B.*, 2023-0409, p. 9 (La. App. 4 Cir. 9/26/23), ___ So.3d ___, ___, 2023 WL 6226289, at *4 n.12 (citing *Mendoza v. Mendoza*, 2017-0070, p. 6 (La. App. 4 Cir. 6/6/18), 249 So.3d 67, 71; La. C.E. art. 201). We take judicial notice that "[p]leural disorders are conditions that affect the tissue that covers the outside of the lungs and lines the inside of [the] chest cavity." *See Pleural Disorders: What Are Pleural Disorders?*, NATIONAL HEART, LUNG, AND BLOOD INSTITUTE (last updated March 24, 2022), https://www.nhlbi.nih.gov/health/pleural-disorders.

- <u>Defense Exhibit F</u>: La Gazzetta Del Messogiorno newspaper article; and

- <u>Defense Exhibit G</u>: Curriculum Vitae of Dr. Michele Carbone, M.D., Ph.D.

Additionally, the trial court heard testimony from Maria Nasini, Mr. Petruzzelli and Dr. Michele Carbone.

1.    *Testimony of Maria Nasini*

Appellants called Maria Nasini as a witness.[8] Maria Nasini testified that she "studied out of middle school"[9] and presently worked "in an internet upper store."[10] She explained that Maria Assunta del Vescovo is her mother; Sergio Nasini was her father; and Giulia Nasini and Giuliano Nasini are her sister and brother, respectively. When asked her understanding of what Sergio Nasini did during his working career, Maria Nasini responded that "he worked at sea." Thereafter, the following colloquy occurred:

> Q.    And before he died did you ever directly discuss with your father the details of what he did while he worked at sea?
>
> A.    No.
>
> Q.    At any time before your father died, did he mention to you that he believed he had been exposed to asbestos while working at sea?
>
> A.    No.
>
> Q.    Do you know when you[r] father's career at sea came to an end?
>
> A.    Yes, in 1985.

---

[8] Because, Maria Nasini only speaks Italian (as testified by Maria Nasini herself), the trial court utilized the services of a translator for her testimony.

[9] In her April 20, 2022 Affidavit, Maria Nasini attested that she "attended school through the Italian equivalent of high school."

[10] The record is unclear as to what Maria Nasini intended by saying "internet upper store."

Q.    Do you know why you father's career at sea came to an end?

A.    Yes, he had a heart attack.

Maria Nasini testified that both she and her mother currently resided in Molfetta, a town in Italy. She also stated that her father resided in Molfetta when he died.

Regarding her father's illness, Maria Nasini testified that Sergio Nasini started displaying the first symptoms, including shortness of breath, in late 2011 and early 2012. "After about one month or perhaps two," according to Maria Nasini's testimony, her father's "condition was degenerating," and "[h]e was getting thinner." Maria Nasini testified that she brought him to another hospital ("the San Paol[o] in Bari") "because he kept having the same symptoms"; "was fatigued"; "had shortness of breath"; and "was walking slowly." Subsequently, the following colloquy occurred regarding Sergio Nasini's illness and treatment:

Q.    And at some point, did he undergo a diagnostic test like a biopsy?

A.    So, at some point they found that he had liquid in his lungs and so they took the liquid out and they performed a biopsy on his lungs.

Q.    [Let us] back up one step. It sounds like you went to a lot of doctor visits with your father from what [you have] testified, is that accurate?

A.    Yes, [I have] always accompanied him. Yes, many visits.

Q.    Amongst your family, and by that I mean your brother and sister and your mother, who accompanied your father the most to his medical visits?

A.    Only once my sister, because I [could not] go there that one time when I was working.

Q.    And you mentioned, ma'am, that your father had a biopsy performed. Do you recall generally what month and year that was?

A.    It was in 2012, I believe it was either March or April.

Q.    And can you tell us if you learned of the results of that biopsy and how you learned the results?

A.    So, they had told me that the results of the biopsy would be available about a month after performing the biopsy. So, I called the hospital and I asked -- I inquired about them and they said, yes, they were ready -- that they were ready, and that they were negative.

. . . .

Q.    So just for the timeline, this is in the spring or summer of 2012?

A.    I cannot recall exactly, but it was around May . . . 2012.

However, according to Maria Nasini's testimony, Sergio Nasini's "condition continued to worsen" after May 2012, so she brought him back to the hospital in San Paolo in September 2012, at which point she learned from a nurse that she had mistakenly been told that Sergio Nasini's biopsy was negative. Maria Nasini explained that the nurse brought her to speak to a doctor,[11] who informed her that Sergio Nasini had lung cancer.

Maria Nasini testified, however, that the doctor never used the word "mesothelioma" in their conversation in September 2012 or discussed potential causes of Sergio Nasini's illness but that she received a copy of his pathology report:

Q.    When you spoke with this doctor, did he ever use the word mesothelioma with you?

A.    No.

. . . .

Q.    When you spoke with this doctor privately, did he discuss with you the cause of your father's illness or cancer?

A.    No.

---

[11] Maria Nasini stated that she spoke with the doctor privately, not in Sergio Nasini's presence.

Q.      At the time you spoke with this doctor, did he even raise the possibility that there was a cause or a particular cause of your father's cancer or tumor?

A.      No.

Q.      At some point were you given a copy of the histologic report or pathology report from the biopsy?

        . . . .

A.      Yes.

Q.      And when were you given that?

A.      When we left.

Q.      And who gave you the paper copy of the report?

A.      It was the nurse that had taken me to talk to the doctor that gave it to me.

Q.      And when did you read that report?

A.      I read it when I went home.

Q.      So, when you left that -- strike that. When you left the hospital that day what illness did you believe your father had?

A.      A tumor.

Q.      The doctor that you spoke with, do you recall whether or not he was a specialist of any kind?

A.      No.

Thereafter, counsel for Appellants showed Maria Nasini Plaintiffs' Exhibit M (the May 2012 pathology report from San Paolo Hospital, Bari, Italy). Maria Nasini confirmed that this was Sergio Nasini's pathology report, which she received in September 2012 and as described in her testimony.

Maria Nasini explained that, after the September 2012 visit, Sergio Nasini returned to the doctor on two or three occasions and that she accompanied him on these visits. Again, Maria Nasini answered in the negative when asked whether,

during these visits, any doctor said to her or to Sergio Nasini in her presence the word "mesothelioma" or mentioned possible causes of Sergio Nasini's tumor. When asked whether "any of the doctors [her] father saw discuss[ed] either asbestos or [her] father's work history with him or [her]," Maria Nasini answered, "No." Additionally, Maria Nasini responded in the negative when asked whether Sergio Nasini ever told her before he died that any doctor had told him he had a tumor or cancer; that any doctor had discussed with him a possible cause of his illness; and that any doctor had mentioned to him or told him that there was a cause of his illness.[12] She stated that Sergio Nasini did not discuss his medical condition with any other family members. Maria Nasini explained that, at the time Sergio Nasini died, the other members of her family knew he had a tumor but did not know the word "mesothelioma" was associated with his illness.

Regarding any conversations she and Sergio Nasini had about his work (at any point in time), Maria Nasini explained that he did not discuss the nature of his work with her. Maria Nasini testified that, prior to 2021, she did not know that her father worked with asbestos products. Rather, according to her testimony, Maria Nasini first learned more about mesothelioma in late 2020 or early 2021 when she heard a radio program discussing mesothelioma and remembered that mesothelioma was what her father died from; and Maria Nasini explained that the radio program discussed the causes of mesothelioma, including asbestos. She explained that, thereafter, in March or April 2021, a former co-worker of Sergio Nasini stopped by Maria Nasini's place of work, and she explained to the former co-worker that her father had "died of a tumor that is associated with asbestos." In

_____

[12] Maria Nasini stated that the doctors told Sergio Nasini "that he had nothing serious and that he would get better." She contended that her father did not know of his diagnosis.

15

response, according to Maria Nasini, the former co-worker informed her that the ships upon which Sergio Nasini had worked were "covered in asbestos." Maria Nasini testified that this constituted the first time that she or anyone in her family (to her knowledge) learned that Sergio Nasini had been exposed to asbestos in the past, as well as the connection between his work and this exposure. Only after this did Maria Nasini contact a lawyer, according to her own testimony.

When questioned on cross-examination about her conversations with Sergio Nasini's doctor and the pathology report, the following colloquy occurred:

Q.     And at one of the doctors' appointments you told us you received a report that listed his diagnosis as mesothelioma?

A.     That he had a tumor.

Q.     And on Exhibit "M" [Sergio Nasini's pathology report], which your attorney showed you earlier, it said that the tumor was mesothelioma?

A. Yes, on the paper it says so, but I was told that he had lung cancer.

. . . .

Q.     And both today and in your affidavit,[13] you state that you never asked the doctor what causes mesothelioma?

A.     No, I never asked the doctors because they had told me that he had lung cancer that would allow him only a few last months of life. And so, I was focused on my father -- I was focusing on my father.

Q.     And when you received the report that said mesothelioma, you never asked any questions about that report?

A.     No. No, because for me, that was just the name of a type of tumor as there are many types of tumors.

Q.     But you remembered the mesothelioma diagnosis when you heard the radio program in late 2020 or 2021?

---

[13] This is in reference to Maria Nasini's aforementioned April 20, 2022 affidavit.

16

A.    Yes. I remembered that could have been the same tumor as my father had, the mesothelioma.

Q.    And you -- in between 2012 and 2020, you never looked up mesothelioma on the internet?

A.    No, because my father was basically given a death sentence.

Q.    And you never looked up mesothelioma on Facebook?

A.    No.

Q.    And so, in March 2021 you made the connection further when a co-worker of your father discussed mesothelioma and asbestos with you?

. . . .

[A.]   Yes.

. . . .

Q.    You knew before that conversation that your father had been a seaman?

A.    Yes, he worked as a seaman.

After the end of Maria Nasini's testimony, Appellants called Mr. Petruzzelli as a witness.

2.    *Testimony of Mr. Petruzzelli*[14]

Mr. Petruzzelli identified himself as a lawyer in Italy, specifically in Bari in the San Paolo Region, where he was employed as "the managing partner of Studio [L]egale Petruzzelli & Partners." Mr. Petruzzelli stated that he had been practicing law in Italy for more than twenty years. Additionally, Mr. Petruzzelli testified that he was the Italian lawyer for the Nasini family. He explained that the family first contacted him in March or April 2021.

---

[14] As with Maria Nasini's testimony, the trial court had an interpreter for Mr. Petruzzelli's testimony, though the transcript indicates that he also speaks English and answered some the questions on his own in English.

In his practice, Mr. Petruzzelli explained that he focused on personal injury and maritime cases. Further, Mr. Petruzzelli testified that his employment resulted in his representation of "many" Italian victims of asbestos disease and that in connection with his practice he represented "[h]undreds and hundreds" of Italian seaman in their asbestos claims. Further, the following colloquy occurred:

> Q. [Bari] and Molfetta. These are both in the Apulia Region of Italy, correct?
>
> A. Yes.
>
> . . . .
>
> Q. And in the mesothelioma cases that you have seen, you have represented a number of residents, hundreds of residents in Apulia who had asbestos related diseases, correct?
>
> A. Yes.
>
> Q. And of almost all of those cases it's been attributed to asbestos exposure, and the cancer cases to mesothelioma specifically?
>
> A. Yes, correct.

Additionally, Mr. Petruzzelli testified that through his work he was familiar with the "Italian National Register of Mesotheliomas [sic] or ReNam" ("ReNam"). In explaining the ReNam, Mr. Petruzzelli stated:

> Generally, when Italian men or women receive a mesothelioma diagnosis, the hospital sends this kind of information about the diagnosis to the local register. . . .
>
> And then when the doctor knows the diagnosis he send[s] the information to the register. But based on my experience . . . just the very big and good hospital[s] like in Rome, Italy, the doctors send this kind of information to the register. Very rarely, a different kind of hospital, based on my experience, just within Bari, Sicily, Compania, Lucca -- Lucca sometimes, they rarely send this kind of information to the register.

Mr. Petruzzelli stated that Sergio Nasini was not included in the ReNam. Similarly, Mr. Petruzzelli testified that Sergio Nasini was not reported to "INAIL," which he

identified as "a republic institute that pays benefits when an Italian man or woman receives an injury during their works [sic]." However, Mr. Petruzzelli further explained that inclusion in INAIL is contingent upon the injured person making a request or claim against INAIL.

Next, counsel for Appellants asked Mr. Petruzzelli whether he had traveled to the United States previously, and he responded, "Yes, many times." Counsel for Appellants then asked Mr. Petruzzelli about lawyer advertising in the United States versus in Italy; and he explained that "there is a big difference" because "[u]nder the Italian rule, [it is] not possible for the Italian lawyer to make that kind of advertisement like the American lawyer." When asked whether one would see advertisements on Italian television about mesothelioma, Mr. Petruzzelli answered, "No, no, absolutely not." When asked whether "the Italian television media besides advertisement . . . generally contain[s] other messages about mesothelioma or asbestos disease causation," Mr. Petruzzelli responded, "Rarely."

Thereafter, counsel for Appellants asked Mr. Petruzzelli about his interactions with Italian physicians who have treated his clients:

> Q. Based on your experience representing Italian seamen and victims of asbestos disease for over twenty years what has been your observation or experience about the generalized level of knowledge amongst Italian medical care professionals about asbestos disease and its causation?
>
> A. Many general practitioners [do not] know the connection between asbestos and mesothelioma, or lung cancer.

Regarding Italian media coverage, Mr. Petruzzelli testified that "[there is] not a big communication by the media in Italy. Sometimes the La Republica, our newspaper, spoke about the mesothelioma connected to asbestos when in Italy there is some

big judgment, like the judgment about the exposure of the city in Caso of Molfetta."

3.      *Testimony of Dr. Carbone*

Appellees called Dr. Michele Carbone, M.D., Ph.D ("Dr. Carbone"), as a witness, and he identified himself as a physician; a professor and Director of Thoracic Oncology at the University of Hawaii and Honolulu; a teacher of anatomic pathology at the University of Molise in Campobasso; a researcher; and "the leading mesotheliogist in the world for the past 30 years."[15] When asked "the extent to which the Italian medical community is familiar with the association of asbestos exposure with mesothelioma," Dr. Carbone responded that "every single doctor in Italy should be familiar with that." When pressed further about his experience in working with doctors in Italy about their understanding of the most common cause of mesothelioma, Dr. Carbone answered that "every doctor will know that mesothelioma is linked to asbestos." However, Dr. Carbone also testified that "the level of knowledge will vary" depending upon the type of doctor. That is, according to Dr. Carbone, an oncologist would know more about mesothelioma than a family medicine physician. At the close of the hearing, the trial court took the matter under advisement.

**October 10, 2022 Judgment and Reasons for Judgment**

After having taken the matter under advisement, on October 10, 2022, the trial court signed a judgment, which granted the Renewed Exception and dismissed Appellants' claims with prejudice. The judgment stated, in pertinent part:

---

[15] At the outset, counsel for Appellants objected that Dr. Carbone should only be allowed to testify in rebuttal. The trial court responded, "Sure. Well, I hope [that is] what [they are] going to do."

This matter came for hearing on September 27, 2022[,] on the Renewed Exception of Prescription . . . .

. . . .

**IT IS ORDERED, ADJUDGED and DECREED** that there be judgment herein in favor of Defendants, Marathon Oil Company, Chevron Shipping Company LLC, Taylor-Seidenbach, Inc., Eagle, Inc., Occidental Petroleum Corp., United States Steel Corp., Air & Liquid Systems Corporation (successor by merger to Buffalo Pumps, Inc.) and Flowserve US, Inc. and against the Plaintiffs Maria Assunta [d]el Vescovo, Guilia Nasini, Guilliano Nasini, and Maria Nasini, individually and on behalf of their deceased husband and father, Sergio Nasini (hereinafter "Plaintiffs") granting the Defendants' Renewed Exception of Prescription, dismissing the claims of the Plaintiffs with prejudice, with each party to pay their own costs.

On the same day of the judgment, the trial court also issued Reasons for Judgment, which stated:

This Court finds that Plaintiffs' claims are prescribed under both the maritime law's three year statute of limitations for Jones Act and general maritime claims and Louisiana's more limited one year liberative prescription.

Nine years passed between the time Sergio Nasini was diagnosed with mesothelioma (the report was dated May 2012, and his daughter acknowledged receipt of the report in September 2012) and eight years passed after his death from mesothelioma on 8 June 2013 before Plaintiffs field [sic] this suit to recover damages for that same mesothelioma and subsequent death. This Court has granted the exceptions and dismissed the case as untimely filed for the following reasons:

1) Mesothelioma is not a generic form of cancer caused by many different potential causes; it is regarded as a signature cancer for asbestos exposure. The decedent's daughter accompanied her father to his doctor's appointment. This Court has a difficult time believing that the doctor did not explain the relationship or inquire into the decedent's occupation.

2) While there [is not] a plethora of attorney advertising in Italy, the link between asbestos and mesothelioma was well known where Mr. Nasini lived at the time of his diagnosis and death, as was the link between seafaring occupation and mesothelioma.

3) The burden of pleading and proving facts to support an interruption of prescription is on the plaintiff. The question is what the

Plaintiffs should have known. When asked if she had a computer at home or work, the decedent's daughter testified that she [did not] have one at home. The Court had to follow up about a computer at work. She had a computer at work; a simple Google search would have shown the link between seafaring and mesothelioma. This Court finds that the discovery was not the link between the disease, asbestos, and seafaring, which was known or should have been known. This Court finds that the decedent's family discovered that they could file a lawsuit to recover for same.

Thereafter, on December 12, 2022, Appellants timely filed their Motion for Devolutive Appeal.

## ASSIGNMENTS OF ERROR

In their brief to this Court, Appellants assert four assignments of error. Specifically, they contend:

1. The trial court sustained [Appellees]' exceptions of prescription after erroneously concluding that a mesothelioma diagnosis alone was sufficient to cause [Appellants]' claims to accrue, a conclusion in conflict with well-established law.

2. In maintaining the exceptions, the trial court erroneously imputed to [Appellants] knowledge of all publicly-available information about seafarers' exposure to asbestos and to mesothelioma.

3. The trial court errored [sic] when making the following evidentiary rulings:

    a.    Admitting hearsay in the form of scientific journal and news media articles (defense Exhibits D, E, and F);

    b.    Admitting foreign-language documents, the relevance of which could not be established in the absence of a translation (defense Exhibit E);

    c.    Admitting two legal complaints filed by unrelated plaintiffs that do not constitute evidence as a matter of law (defense Exhibits B and C);

    d.    Admitting improper rebuttal testimony from a surprise expert witness testifying outside his area of expertise.

4. The record lacked sufficient admissible evidence to prove that [Appellants]' claim accrued more than three years before they filed their case.

Based on Appellants' assignments of error and our review of the record, we find it necessary to analyze this appeal under two main issues. First, we will consider whether, under the federal discovery rule or under Louisiana's principle of *contra non valentem*, the limitations period in a latent disease case starts when a claim is knowable with reasonable diligence or when a plaintiff actually discerns his injury and its specific cause.[16] Second, we will determine whether the facts of this case lead to prescription. Before reaching these two issues, however, we begin our discussion with the applicable standard of review.

## DISCUSSION

### *Standard of Review*

As stated at the outset, this is a maritime case because Sergio Nasini allegedly contracted mesothelioma from asbestos exposure while working at sea. As the Louisiana Supreme Court has explained, "States may apply their own appellate standards of review in maritime cases because 'questions pertaining to the scope of appellate review are procedural in character.'" *Milstead v. Diamond M Offshore, Inc.*, 1995-2446, p. 11 (La. 7/2/96), 676 So.2d 89, 96 (quoting *Maxwell v. Olsen*, 468 P.2d 48, 52-53 (Alaska 1970)). In *Medical Review Panel Proceedings for Timpton v. Touro Infirmary*, this Court explained the standard of review that Louisiana appellate courts apply to a trial court's ruling on an exception of prescription:

> "A peremptory exception generally raises a purely legal question." *Wells Fargo Fin. [La.], Inc. v. Galloway*, [20]17-0413, p. 7 (La. App. 4 Cir. 11/15/17), 231 So.3d 793, 799-800. "Nonetheless, evidence may be introduced in the trial court to support or controvert

---

[16] Because Appellants raised issues of federal and Louisiana laws in their Original Petition and Amended Petition, this Opinion will address both federal and Louisiana laws.

a peremptory exception of prescription." *Id.* [at] p. 7, 231 So.3d at 800. Therefore, "[t]he standard of review of a trial court's ruling on a peremptory exception of prescription turns on whether evidence is introduced." *Id.*

"If evidence is introduced, the trial court's factual findings are reviewed for manifest error." *Russ v. City of New Orleans*, [20]19-0579, p. 2 (La. App. 4 Cir. 8/28/19), 279 So.3d 1006, 1008, *writ not considered*, [20]19-01539 (La. 11/19/19), 282 So.3d 1063, *reconsideration denied*, [20]19-01539 (La. 1/22/20), 291 So. 3d 1039. "When no evidence is introduced, the decision is purely legal and requires a *de novo* review." *Id.* "Under those circumstances, the exception is decided based on the facts alleged in the petition, which are accepted as true." *Id.*

2020-0522, p. 4 (La. App. 4 Cir. 2/10/21), 313 So.3d 1022, 1026-1027 (footnote omitted). Because the parties introduced evidence at the hearing on the Renewed Exception, we will review any factual findings made by the trial court for manifest error.

***Issue Number One: Whether, Under the Federal Discovery Rule or Contra non Valentem in Louisiana Law, the Statute of Limitations or Prescriptive Period in a Latent Disease Case Starts When a Claim is Knowable with Reasonable Diligence or when a Plaintiff Actually Discerns His Injury and Its Specific Cause***

As mentioned previously, this is a Jones Act and general maritime case. Appellants raised allegations under both federal and Louisiana laws in their Original Petition and Amended Petition. Further, in its October 10, 2022 judgment, the trial court concluded that Appellants' claims were prescribed under both federal and Louisiana laws. Accordingly, we will address both federal statute of limitations laws and Louisiana prescriptive laws.

*Federal Prescriptive Period and the Discovery Rule*

Starting with the federal prescriptive period, 46 U.S.C. § 30106, which is part of the Jones Act, provides that "[e]xcept as otherwise provided by law, a civil action for damages for personal injury or death arising out of a maritime tort must

24

be brought within 3 years after the cause of action arose." Statutes of limitations, such as 46 U.S.C. § 30106, "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *Kubrick*, 444 U.S. at 117, 100 S.Ct. at 357 (citations omitted).

However, as the United States Court of Appeals for the Fifth Circuit has explained, if a "plaintiff has sustained 'a latent injury which either is not or cannot be discovered until long after the tortious act that caused the injury has occurred . . . courts have routinely applied the so-called discovery rule.'" *Clay v. Union Carbide Corp.*, 828 F.2d 1103, 1106 (5th Cir. 1987) (citing *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 229 (5th Cir. 1984)). "When the discovery rule applies, the plaintiff's cause of action does not accrue on the date the tortious act occurred, but on the date the plaintiff discovers, or reasonably should have discovered, both the injury and its cause." *Albertson*, 749 F.2d at 229 (citing *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359). The discovery rule is based on the premise that in a latent injury case, "[l]ogic and sound jurisprudence mandate the conclusion that a plaintiff's cause of action does not accrue . . . until the injury and the cause are knowable." *Albertson*, 749 F.2d at 231.

As explained by the United States Supreme Court in *Kubrick* though, "a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should [not] receive identical treatment." 444 U.S. at 122, 100 S.Ct. at 359. That is, even if a plaintiff's injury in fact "may be unknown or unknowable until the injury manifests itself," thereafter the plaintiff "can protect himself [or herself] by seeking advice in the medical and legal community" because Congress

25

did not intend that "'accrual' of a claim must await awareness by the plaintiff that his injury was negligently inflicted." *Id.*, 444 U.S. at 122-23, 100 S.Ct. at 359-60. Thus, the federal discovery rule "imposes on injured plaintiffs an affirmative duty to investigate the potential cause of a known injury." *Marburgh v. Union Pac. R.R. Co.*, 8:19CV22, 2021 WL 1893222, at *2 (D. Neb. May 11, 2021) (citing *Tolston v. Nat'l R.R. Passenger Corp.*, 102 F.3d 863, 865 (7th Cir. 1996)). It applies "only when a plaintiff is unaware of and has had no reasonable opportunity to discover the critical facts of his injury and its cause." *Albertson*, 749 F.2d at 233. Federal courts have applied the discovery rule to Jones Act cases; but, as with other discovery rule cases, the courts have specifically noted that, "a Jones Act[] 'cause of action accrues for statute of limitations purposes when a reasonable person knows *or in the exercise of reasonable diligence should have known* of both the injury and its governing cause.'" *Badamo v. Chevron U.S.A. Inc.*, 602 F.Supp.3d 646, 656 (S.D. NY 2022) (emphasis added) (quoting *Tolston*, 102 F.3d at 865).

Only "if a plaintiff shows that a reasonable inquiry would have been futile" can the plaintiff "overcome the fact that the failure to inquire was unreasonable and still rely on the discovery rule." *Smith v. BP Expl. & Prod. Inc.*, No. 2022-4391, 2023 WL 1428851, at *9 (E.D. La. Jan. 5, 2023). That is, "a plaintiff is only deemed to know what a reasonable inquiry would have revealed . . . ." *Id.* For example, in *Jones v. Evonik Corp.* and *Fortado v. Evonik Corp.*, the United States District Court for the Eastern District of Louisiana concluded that even if the plaintiffs had made a reasonable inquiry into the causal link between the exposure at issue and their illnesses and had exercised due diligence, this would have been futile because the record reflected that the defendant facility's harmful level of a certain chemical was not publicly known when the plaintiffs were diagnosed with

cancer. 620 F.Supp.3d 508, 518 (E.D. La. 2022); No. 22-1518, 2022 WL 4448230, at *8 (E.D. La. Sept. 23, 2022).

Typically, application of the discovery rule is a question of fact, thus rendering it an appropriate determination for the trier of fact. *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 360 (1st Cir. 2009) (citing *In re Mass. Diet Drug Litig.*, 338 F.Supp.2d 198, 204 (D. Mass. 2004); *Wolinetz v. Berkshire Life Ins. Co.*, 361 F.3d 44, 48 (1st Cir. 2004)). Specifically, the trier of fact must determine "what the plaintiff knew or should have known," including whether "a plaintiff had notice of the likely cause of [his or] her injury." *Id.* (quoting *Koe v. Mercer*, 450 Mass. 97, 876 N.E.2d 831, 836 (2007)) (citing *Riley v. Presnell*, 409 Mass. 239, 565 N.E.2d 780, 786 (1991)).

*Louisiana's Prescriptive Period and Contra Non Valentem*

Louisiana law establishes a one-year prescriptive period for the claims asserted in Appellants' Original Petition and Amended Petition. *See* La. C.C. art. 3492;[17] La. C.C. art. 2315.1;[18] and La. C.C. art. 2315.2.[19] As explained in La. C.C. art. 3467, "[p]rescription runs against all persons unless exception is established by legislation." When a defendant raises the peremptory exception of prescription, this serves as "a procedural device by which a defendant may obtain dismissal of

---

[17] Louisiana Civil Code Article 3492 provides, in pertinent part, that "[d]elictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained."

[18] Louisiana Civil Code Article 2315.1 states that "[i]f a person who has been injured by an offense or quasi offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi offense, shall survive for a period of one year from the death of the deceased . . . ."

[19] Regarding wrongful death actions, La. C.C. art. 2315.2 provides that "[t]he right of action granted by this Article prescribes one year from the death of the deceased."

the action because it is time-barred." *Timpton*, 2020-0522, pp. 4-5, 313 So.3d at 1027 (quoting *Felix v. Safeway Ins. Co.*, 2015-0701, p. 4 (La. App. 4 Cir. 12/16/15), 183 So.3d 627, 630). Prescriptive rules "are designed to prevent old and stale claims from being prosecuted." *Slaughter v. Cent. United Life Ins. Co.*, 51,961, p. 6 (La. App. 2 Cir. 6/27/18), 250 So.3d 1160, 1164 (citing *Wells v. Zadeck*, 2011-1232, p. 7 (La. 3/30/12), 89 So.3d 1145, 1149; *Campo v. Correa*, 2001-2707 (La. 6/21/02), 828 So.2d 502). Nevertheless, "[u]nder Louisiana jurisprudence, prescriptive statutes are to be strictly construed in favor of the obligation sought to be extinguished, thereby allowing a plaintiff to proceed with the enforcement of a claim." *Timpton*, 2020-0522, p. 5, 313 So.3d at 1027 (quoting *Crosby v. Sahuque Realty Co.*, 2012-1537, p. 7 (La. App. 4 Cir. 8/21/13), 122 So.3d 1197, 1202). That is, if there are two possible constructions of a prescriptive statute (one which favors maintaining the action and one which favors barring the action), then the construction that favors maintaining the action should be adopted. *Succession of Mosing*, 2021-0009, p. 17 (La. App. 3 Cir. 12/8/21), 331 So.3d 1013, 1026 (quoting *Carter v. Haygood*, 2004-0646, p. 10 (La. 1/19/05), 892 So.2d 1261, 1268).

The burden of proof on an exception of prescription rests with the exceptor. *In re Hume*, 2014-0844, 0845, p. 5 (La. App. 4 Cir. 4/1/15), 165 So.3d 233, 238 (citing *Dewailly v. Lexington Ins. Co.*, 2009-0020, p. 2 (La. App. 4 Cir. 9/16/09), 23 So.3d 368, 369). If, however, prescription is evident on the face of the petition, then "the burden shifts to the plaintiff to prove that the claim has not prescribed." *Id.* at pp. 5-6, 165 So.3d at 238 (quoting *Denoux v. Vessel Mgmt. Servs., Inc.*, 2007-2143, p. 5 (La. 5/21/08), 983 So.2d 84, 88). The plaintiff can rely on three legislative principles to meet the burden of establishing that the claim has not

28

prescribed, namely suspension, interruption, and renunciation. *LeBreton v. Rabito*, 1997-2221, p. 6 (La. 7/8/98), 714 So.2d 1226, 1229 (citing *Wimberly v. Gatch*, 1993-2361 (La. 4/11/94), 635 So.2d 206, 211). Likewise, a "party who asserts the benefit of *contra non valentem* bears the burden of proving its requisite elements and applicability." *Timpton*, 2020-0522, p. 5, 313 So.3d at 1027 (quoting *M.R. Pittman Grp., L.L.C. v. Plaquemines Par. Gov't*, 2015-0860, p. 9 (La. App. 4 Cir. 12/2/15), 182 So.3d 312, 319).

The Louisiana Supreme Court has explained that the Louisiana doctrine of *contra non valentem* "has effects similar to that of the 'discovery' rule most courts now apply in cases involving claims for relief based on a disease with a long incubation period, such as asbestosis or mesothelioma . . . ." *Cole v. Celotex Corp.*, 599 So.2d 1058, 1084 (La. 1992) (Dennis, J., concurring) (citing *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 115-17, n.22-32 (D.C. Cir. 1982)). Like the discovery rule, "[c]*ontra non valent[e]m* is a Louisiana jurisprudential doctrine under which prescription may be suspended." *In re Hume*, 2014-0844, p. 6, 165 So.3d at 238 (quoting *Carter*, 2004-0646, p. 11, 892 So.2d at 1268). One situation in which *contra non valentem* applies is "where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant." *Wells*, 2011-1232, p. 9, 89 So.3d at 1150.

Under *contra non valentem*, prescription begins when the plaintiff receives "actual or constructive knowledge of facts" that would indicate "to a reasonable person that he or she is the victim of a tort." *Hughes v. Olin Corp.*, 37,404, p. 3 (La. App. 2 Cir. 10/3/03), 856 So.2d 222, 225 (citing *Campo*, 2001-2707, pp. 11-12, 828 So.2d at 510). "Constructive knowledge sufficient to commence the running of prescription requires more than a mere apprehension that something

might be wrong." *Id.* (citing *Cordova v. Hartford Accident & Indem. Co.*, 387 So.2d 574, 577 (La.1980)). Rather, "[a]n injured party has constructive notice of his condition when he possesses information sufficient to incite curiosity, excite attention, or put a reasonable person on guard to call for inquiry." *Id.* (citing *Boyd v. B.B.C. Brown Boveri, Inc.*, 26,889, p. 8 (La. App. 2 Cir. 5/10/95), 656 So.2d 683, 688). As this court has explained, "[w]hen prescription begins to run depends on the reasonableness of a plaintiff's action or inaction." *Goodman v. Dixie Mach. Welding & Metal Works, Inc.*, 552 So.2d 440, 443 (La. App. 4th Cir. 1989) (quoting *Jordan v. Emp. Transfer Corp.*, 509 So.2d 420, 423 (La.1987)).

Additionally, as this Court has previously explained, "[*c*]*ontra non valentem* 'will not exempt a plaintiff's claim from running if his ignorance is attributable to his own willfulness, neglect, or unreasonableness.'" *Albe v. City of New Orleans*, 2014-0186, p. 10 (La. App. 4 Cir. 9/17/14), 150 So.3d 361, 368 (quoting *Dominion Expl. & Prod., Inc. v. Waters*, 2007-0386, p. 14 (La. App. 4 Cir. 11/14/07), 972 So.2d 350, 360). Further, as the Louisiana Second Circuit Court of Appeal has held, "[P]roof of a cause of action cannot be equated with knowledge, actual or constructive. It is the latter which governs the date on which prescription begins to run." *Boyd*, 26,889, p. 9, 656 So.2d at 689 (citing *Gulf States Land & Dev., Inc. v. Ouachita Nat'l Bank in Monroe*, 612 So.2d 1031, 1035 (La. App. 2d Cir. 1993); and *Maison Blanche, Inc. v. La. Dep't of Labor, Off. of Emp. Sec.*, 604 So.2d 670, 674 (La. App. 1st Cir. 1992)). Like the discovery rule, application of *contra non valentem* necessitates asking whether further inquiry by the plaintiff would have led to knowledge of the cause of the injury. *See Marin v. Exxon Mobil Corp.*, 2009-2368, p. 18 (La. 10/19/10), 48 So.3d 234, 248. The Louisiana Supreme Court has held that "*contra non valentem* only applies in 'exceptional circumstances.'"

30

*Renfroe v. State ex rel. Dep't of Transp. & Dev.*, 2001-1646, p. 9 (La. 2/26/02), 809 So.2d 947, 953 (quoting La. C.C. art. 3467, Official Revision Comment (d); *State ex rel. Div. of Admin. v. McInnis Bros. Constr., Inc.*, 1997-0742, p. 3 (La. 10/21/97), 701 So.2d 937, 940).

Similar to the discovery rule, Louisiana jurisprudence has held that the benefit of the application of *contra non valentem* requires a plaintiff to have inquired into the cause of his injury. For example, in *Lennie v. Exxon Mobil Corp.*, plaintiffs, who were the children and surviving spouse of the decedent, Julius Lennie ("Mr. Lennie"), appealed the trial court's judgment, which sustained defendants' exceptions of prescription. 2017-204, p. 1 (La. App. 5 Cir. 6/27/18), 251 So.3d 637, 640. In affirming the trial court, the Louisiana Fifth Circuit Court of Appeal ("Louisiana Fifth Circuit") declined to apply *contra non valentem*, finding that Mr. Lennie's diagnosis of lung cancer "put [them] on guard . . . to inquire further into the cause of his condition," which they failed to do. *Id.* at p. 15, 251 So.3d at 648. The Louisiana Fifth Circuit explained:

> From 1961 to 1994, Julius Lennie worked as an employee of Tuboscope, a company that was hired by various oil companies and pipe cleaning contractors to clean and refurbish used oilfield production pipe and tubing. The cleaning process used by Tuboscope involved grinding scale out of the used pipe, a process that allegedly caused the emission of naturally occurring radioactive material ("NORM"). Mr. Lennie retired from Tuboscope in 1994.
>
> On January 28, 2010, approximately fifteen years after his retirement, Mr. Lennie was diagnosed with lung cancer. Mr. Lennie died less than a month later, on February 20, 2010. Nearly four years later, on January 2, 2014, Mr. Lennie's surviving spouse, Patricia Lennie, and his children, Brett Lennie and Marcella Lennie Fueslier, filed a survival and wrongful death suit against various oil companies and pipe cleaning contractors that had hired Tuboscope to clean and refurbish used oilfield pipe.
>
> . . . .

31

The Lennies have offered no evidence as to what they understood caused Mr. Lennie's lung cancer and subsequent death. There is no evidence that they reasonably relied on a doctor's explanation as to the cause of Mr. Lennie's lung cancer; to the contrary, they testified that they did not speak with Mr. Lennie's doctors about what caused his cancer. Evidence was introduced that Mr. Lennie was a heavy smoker, but none of the Lennies stated that they believed that smoking caused the decedent's lung cancer. Additionally, none of the Lennies stated that they had a conversation with Mr. Lennie himself as to what he believed caused his lung cancer. Each of them testified that they made no inquiry whatsoever into the cause of Mr. Lennie's lung cancer. While under the facts of this case it may not have been reasonable for the Lennies to contact Mr. Lennie's former co-workers following his death from lung cancer when they had no knowledge of NORM, its hazardous effects, or of Mr. Lennie's potential exposure to it at the workplace, their failure to make even a rudimentary inquiry into the causes of Mr. Lennie's illness and death appears unreasonable.

*Id.* at pp. 1, 13-14, 251 So.3d at 640, 647-48 (footnote omitted). *See also Henderson v. Todd Shipyards*, 462 So.2d 242, 243 (La. App. 4th Cir. 1984) (affirming the trial court's grant of prescription and noting that the "plaintiff made no showing that she had inquired into the cause of her husband's death [from lung cancer], but had rather simply rested upon assumption that his death had been caused by his heavy smoking").

***Under the Federal Discovery Rule and Louisiana's Principle of Contra Non Valentem, the Injury and Its Cause Must Only be Knowable for the Statute of Limitations or Prescription to Commence***

As the previous sections established, both the federal discovery rule and Louisiana's principle of *contra non valentem* will not apply if the plaintiff's injury and its cause were knowable to the plaintiff. Notably, the *Albertson* case states that under the discovery rule, the statute of limitations commences when the "injury and the cause are *knowable*" to the plaintiff, not that they must be known to the plaintiff. 749 F.2d at 231 (emphasis added). Likewise, prescription commences under *contra non valentem* when a plaintiff has constructive notice, which depends

upon the reasonableness of the plaintiff's actions. A plaintiff's ignorance of his cause of action cannot be willful because the jurisprudence under both the discovery rule and *contra non valentem* indicates that the plaintiff has a duty to discover his or her injury and its cause. Thus, considering the foregoing jurisprudence, we find that the statutes of limitations under federal law and the prescriptive periods under Louisiana law start when a plaintiff discovers or reasonably should have discovered his or her injury and its cause in a latent disease case, unless the plaintiff can demonstrate that such an inquiry would have been futile.

### Issue Number Two: Whether the Facts of this Case Lead to a Finding of Prescription

As stated previously, Appellants filed their Original Petition on August 27, 2021. They contend that prescription did not commence until they learned that Sergio Nasini's mesothelioma diagnosis was work-related in late 2020 or early 2021, after which time they filed their Original Petition within one-year. Because they rely on the discovery rule and *contra non valentem* in their attempt to defeat prescription, Appellants bore the burden of proof.

It is undisputed that Maria Nasini first learned of Sergio Nasini's mesothelioma diagnosis in September 2012; Maria Nasini accompanied Sergio Nasini to his medical appointments; Appellants knew that Sergio Nasini was a seaman; and Appellants did not file suit until nearly nine years after Maria Nasini learned of Sergio Nasini's mesothelioma diagnosis. According to the jurisprudence applying the discovery rule and *contra non valentem*, an injured plaintiff has an affirmative duty to investigate the potential cause of a known injury. Thus, upon learning of Sergio Nasini's diagnosis of mesothelioma in 2012, Appellants had a

duty to investigate the potential cause of his injury in order for the discovery rule or *contra non valentem* to apply and suspend the statute of limitations or prescription. Alternatively, Appellants needed to demonstrate that a reasonable inquiry into the cause of Sergio Nasini's illness would have been futile. Appellants have shown neither.

Like the plaintiffs in *Lennie*, Appellants have offered no evidence as to what they understood caused Sergio Nasini's mesothelioma diagnosis and subsequent death or what inquiries they made to determine this starting in 2012.[20] In fact, in her affidavit, Maria Nasini stated that "[a]mong the five of us, no one wondered out loud what caused my father's illness diagnosed in 2012. No one asked or raised the issue of a cause in my presence . . . ." There is no evidence that Appellants reasonably relied on a doctor's explanation and assertions as to another cause for Sergio Nasini's lung cancer or that it was something "natural and expected." *Cf. Griffin v. Kinberger*, 507 So.2d 821, 823 (La. 1987) (reversing the grant of an exception of prescription in a medical malpractice action wherein physicians actively and erroneously assured the child's mother that the child's vision loss was a "natural and expected consequence of the necessary administration of oxygen to premature children at birth"). To the contrary, Maria Nasini testified that they did not speak with Sergio Nasini's doctors about what caused his mesothelioma. When asked whether she ever asked the doctor what caused Sergio Nasini's mesothelioma, Maria Nasini responded, "No, I never asked the doctors." Thus, we

---

[20] Of note, in their arguments throughout this case, Appellants note that Maria Nasini has only a middle school education. Though Maria Nasini testified that she "studied out of middle school," at the September 27, 2022 hearing, her April 20, 2022 affidavit explains that she attended school through the Italian equivalent of high school. In *Lennie*, the Louisiana Fifth Circuit noted that two of the three appellants' maximum education level was a high school diploma. 2017-0204, pp. 11-12, 251 So.3d at 646.

find that Appellants' ignorance of the cause of Sergio Nasini's illness was "attributable to [their] own willfulness, neglect, or unreasonableness." *See Albe*, 2014-0186, p. 10, 150 So.3d at 368 (quoting *Dominion Expl. & Prod., Inc.*, 2007-0386, p. 14, 972 So.2d at 360).

To this end, in Maria Nasini's testimony and affidavits, as well as in Appellants' arguments to this Court, there is an emphasis that no doctor ever informed Maria Nasini of the cause of Sergio Nasini's illness; however, the record lacks evidence that the Appellants themselves asked the doctors what caused Sergio Nasini's illness or any questions about the illness at all to obtain information. Appellants had the burden of inquiring: they cannot circumvent the requirement of inquiry by blaming the doctors for not informing them. Instead, Maria Nasini testified that, after reading "mesothelioma" on the pathology report, "for me, that was just the name of a type of tumor as there are many types of tumors." Essentially, Maria Nasini rested on an assumption that this was just one of many types of tumors, and a plaintiff cannot benefit from a delayed accrual of prescriptive rates based on a mere assumption. *See Henderson*, 462 So.2d at 243 (declining to apply *contra non valentem* because the plaintiff simply rested upon an assumption that her husband's death had been caused by his heavy smoking). Considering Maria Nasini's statement that "there are many types of tumors," it is unreasonable that she would not inquire about the particular type of tumor ailing her father or what might have caused it to develop. Moreover, considering that Maria Nasini testified that she was told Sergio Nasini had lung cancer but then read in his pathology report the word "mesothelioma" and assumed it was just one of many types of tumors, it is unreasonable that Maria Nasini did not ask for

clarification about the connection between lung cancer, mesothelioma, and tumors given all the different terminology she was hearing and reading.

Additionally, Appellants argue a lack of internet access as a reason for their lack of information about mesothelioma; but, of note, when asked if she ever looked up mesothelioma on the internet after learning of the diagnosis in 2012, Maria Nasini responded, "No, because my father was basically given a death sentence." Thus, she did not blame the failure to research on a lack of internet access as Appellants now purport to be the reason. As in *Lennie*, Appellants' failure to make even a rudimentary inquiry into the causes of Sergio Nasini's illness and death was unreasonable.

Further, unlike the plaintiffs in *Jones* and *Fortado*, Appellants failed to establish that even if they had made a reasonable inquiry into the causal link between the exposure at issue and Sergio Nasini's illness and had exercised due diligence, this would have been futile due to a lack of public knowledge. Instead, Appellants contend generally in their Brief that "public awareness of asbestos hazards decreased in Europe after countries banned asbestos (a ban Italy imposed in 1992)." The record does not support Appellants' contention that an inquiry would have been futile. Mr. Petruzzelli testified at the September 27, 2022 hearing that Italy maintains ReNam, which is a database of mesothelioma diagnoses. He also testified that he has represented "[h]undreds and hundreds" of Italian seaman in Appellants' region of Italy in their asbestos claims. While Mr. Petruzzelli's April 20, 2022 affidavit states that "the degree of general awareness of the Italian population in relation to the link between asbestos and the onset of certain asbestos diseases and pathologies is not to be considered either widespread or exhaustive," the phrasing "widespread or exhaustive," along with Mr. Petruzzelli's other

testimony, does not equate to a complete lack of public knowledge as in *Jones* and *Fortado*.

Of note, Appellants also offered as an exhibit attached to their Opposition to the Renewed Exception the 2021 Research Paper, and they essentially cite to that paper in their Brief as support for their contention that even if they had asked Sergio Nasini's doctors about mesothelioma it would have been futile. However, the 2021 Research Paper states that the study reported therein rendered the following responses:

- 100% of respondents answered affirmatively that asbestos exposure is harmful for human health;

- 100% of respondents answered affirmatively that asbestos exposure in living and workplace environments increases the risk of mesothelioma development;

- 39.3% of respondents answered affirmatively that the latency period of mesothelioma is typically longer than 25 years; and

- 96.4% responded affirmatively that pleural mesothelioma is associated with asbestos exposure.

Rather than support Appellants' contention that an inquiry about Sergio Nasini's diagnosis would have been futile, we find that the 2021 Research Paper does the opposite.

In particular, it demonstrates a high level of awareness (96.4%) that the pleural mesothelioma from which Sergio Nasini suffered is associated with asbestos exposure, and it shows that all respondents knew that asbestos exposure in living environments increased the risk of mesothelioma. Thus, this indicates that Appellants likely would have learned the cause of Sergio Nasini's illness by simply seeking more information.

Noting that the trial court listed other reasons for its decision in its reasons for judgment, we conclude that the end result is, nonetheless, the same. The trial court did not err in its application of the discovery rule and *contra non valentem* and in concluding that the facts of this case lead to a finding of prescription. In so concluding, our discussion has addressed Appellants' first and fourth assignments of error.

We find Appellants' allegations regarding the trial court's evidentiary rulings (i.e., assignment of error number three) are of no merit because, as we have outlined above, the other evidence (all offered by Appellants themselves) established that Appellants' claims were prescribed by the time they filed the Original Petition. Additionally, we find it unnecessary to address Appellants' contention that "the trial court erroneously imputed to [Appellants] knowledge of all publicly available information about seafarers' exposure to asbestos and mesothelioma" (i.e., assignment of error number two). As delineated in our discussion, the record demonstrates that there were other ways that Appellants might have learned more information about the cause of Sergio Nasini's illness if they had made a reasonable inquiry. Therefore, we pretermit discussion of those assignments of error.

## DECREE

For the foregoing reasons, we affirm the trial court's October 10, 2022 judgment, which granted the exception of prescription in favor of Appellees and dismissed Appellants' claims with prejudice.

**AFFIRMED**

38